(90 South. 145)

No. 24920.

### HALL v. GODCHAUX.

(Sept. 20, 1921. Dissenting Opinions, Oct. 3, 15, 1921.)

*(Syllabus by Editorial Staff.)*

1. **Elections 149—Nomination of successful candidate may be contested on ground of ineligibility.**

The nomination of successful primary election candidate may be contested on the ground of his ineligibility under Primary Election Law of 1916 (Act No. 35 of 1916), § 11, as amended by Act No. 210 of 1920 and Const. 1913, art. 210, describing qualifications of candidates, in view of articles 109, 201, 209, and Primary Election Law 1916, § 9, notwithstanding failure of section 25, as amended by Act No. 210 of 1920, to make ineligibility of candidate a ground of contest, since no other grounds are specifically declared.

2. **Elections 154(9½)—Contestant need not allege facts sustaining his own nomination.**

In a primary election contest under Act No. 35 of 1916, as amended by Act No. 210 of 1920, contestant need not allege the facts to sustain his own nomination; facts challenging nomination of contestee being sufficient.

3. **Elections 149—Candidate not estopped from contesting nomination of opponent on ground of ineligibility.**

Unsuccessful primary election candidate was not estopped from contesting the nomination of successful candidate on the ground of ineligi-

bility by reason of having entered the contest with such alleged ineligible candidate.

4. **Elections 126(4)—Occasional resident of hotel held not "actual bona fide resident" of precinct in which hotel was situated.**

Primary election candidate who had sold his permanent residence in New Orleans while living in summer home in other state, and whose only residence in precinct of other ward during the six months preceding election was a hotel where he lived only occasionally and where he registered and was assigned a room whenever he returned and where he paid for the use of the room only during the time that he actually occupied it, *held* inelegible, not being an "actual bona fide resident" of such precinct during such six months within Const. 1913, art. 197, § 1.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Actual Bona Fide Resident.]

5. **Elections 126(4)—"Actual bona fide resident," within constitutional provision as to qualifications of elector, defined.**

An "actual bona fide resident," within Const. 1913, art. 197, § 1, describing qualifications of an elector, need not have occupied his place of abode every moment during the required period of time, but must have maintained such a relation with the place or premises as will entitle him at his will, without making new arrangements therefor on each return, to occupy such place whenever his necessities or pleasure required, without asking permission of some one else.

Provosty, Overton, and Porter, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Suit by Luther E. Hall against Emile Godchaux. Judgment for defendant, and plaintiff appeals. Reversed, with directions.

George Wesley Smith, of Rayville, and Thomas E. Furlow, Paul A. Sompayrac, and L. E. Hall, all of New Orleans, for appellant.

Gustave Lemle, R. E. Milling, Esmond Phelps, and R. C. Milling, all of New Orleans, for appellee.

DAWKINS, J. The plaintiff, J. Zach Spearing, Harry P. Gamble, and defendant were candidates in the Democratic primary

of August 23, 1921, for nomination by that party as its representative in a special election ordered pursuant to ·the Constitution of 1921 to fill the vacancy upon this court caused by the retirement of the Chief Justice. Defendant received, in round figures, 12,000, plaintiff 6,000, Spearing 3,000, and Gamble 1,000, first choice votes, thus giving defendant a clear majority, and which, in the absence of contest, would have made him the nominee.

However, within the time prescribed by law, plaintiff brought this suit attacking Godchaux's right to the nomination, upon the ground that the latter is not a qualified elector, as required by the Constitution and laws of this state, and therefore ineligible to receive the nomination. For this reason, plaintiff alleges and contends that the votes cast for defendant were illegal, should not be counted, and that, as between himself and the other two candidates, he received a majority of the valid first choice votes, and hence should be declared the nominee.

Defendant .excepted to the jurisdiction ratione materiæ, and, this being overruled, excepted further that the petition disclosed no cause of action. The exception of no right or cause of action was, in effect, referred to the merits, and there was judgment on the merits below rejecting plaintiff's demands and declaring defendant the nominee.

Plaintiff prosecutes this appeal, and defendant has answered, reurging the exceptions above mentioned.

#### Opinion.

[1] The first question to be determined is the plea to the jurisdiction. It is based upon the proposition that the question raised is a political one, and the courts have no power to pass upon it, unless that power be expressly given, by the law. In support of this proposition abundant authority, including decisions of this court, is cited, which we deem unnecessary to review. Counsel say that ineligibility is not a ground of contest under the Primary Election Law of 1916 (Act No. 35, § 25), as amended by the Act No. 210, § 6, of 1920. Neither is any other cause specifically declared. The section in question (No. 25) reads:

"Any candidate * * * who shall claim to have been nominated, and shall desire to contest the election, shall present a petition to the judge of the district court, * * * which petition shall set forth specifically and in detail the grounds on which the contest is based and the irregularities or frauds of which complaint is made."

The act, in its title, declares, among other things, its purpose "to prescribe the qualifications of electors participating in and of candidates for nomination to be voted for at said primary election"; and section 9 provides:

"That the qualifications of voters and of candidates, in all primary elections held under this act, shall be the same as now required by the Constitution and election laws of this state for voters at general elections and the further qualifications prescribed by this act; and subject to an additional political qualification which may be prescribed by the state central committees of the respective political parties coming under the provisions of this act. * * * "

As above indicated. we look in vain for any provision declaring what violations of the statute shall be cause for contest of an election; nor do we find any for contesting the qualifications of a voter, for the very good reason in the latter case, no doubt, that the Constitution (article 201) at that time, as does the one of 1921, provided the method and causes for contesting the exercise of the elective franchise. But we do find in section 11 the further requirement:

"That any person desiring to become a candidate * * * shall * . * * file * * * his written notification * * * accompanied by a declaration that he is a duly qualified elector under the Constitution and laws of this state. * * * "

In addition to these statutory requirements, the Constitution of 1913 provides:

"Art. 210. No person shall be eligible to any office, state, judicial, parochial, municipal or ward, who is not a citizen of this state and a duly qualified elector of the state, district, parish, municipality or ward, wherein the functions of said office are to be performed. * * * *"

Can it be said that a requirement so uniformly and emphatically prescribed, both by the statute and the Constitution, is one which may not be met, and yet the courts be without power to hear an opposing candidate complain of such failure? especially where the statute in the broadest terms prescribes:

"That in elections held under the provisions of this act all contests shall be made before the courts of the state, as herein prescribed, which are hereby fully vested with the necessary power, authority and jurisdiction to hear, try and determine the same."

Then, again, the Constitution of 1913, art. 209, directs the Legislature to provide for contested elections in the following language:

"Art. 209. The General Assembly shall provide by law for the trial and determination of contested elections of all public officers, whether state, judicial, parochial or municipal (except Governor and Lieutenant Governor), which trials shall be by the courts of law and at the domicile of the party defendant."

It would seem that, under this article, no tribunal other than the courts could be vested with power to try election contests. And in article 109 district courts are given jurisdiction to try "all cases where the title * * * to office, or other public positions, or civil or political rights, * * * are involved."

In view of these provisions of the law, we think it clear that the courts are given ample authority to determine the qualifications of a candidate for office.

Counsel cite and rely upon the case of Roussel v. Dornier, 130 La. 367, 57 South. 1007, 39 L. R. A. (N. S.) 826. That was a

case in which a candidate for sheriff sought to have the Democratic committee, under a provision vesting jurisdiction in it to try contests, declare him the nominee, and, failing, appealed to the courts. What the court held was that the Legislature had not vested in the committee jurisdiction to test the eligibility of a candidate. It follows that the courts as appellate tribunals could not try an issue which could not be raised before the committee.

The plea to the jurisdiction was therefore properly overruled.

Exception of no Cause or Right of Action.

[2] This exception is based upon the contention that, inasmuch as plaintiff alleges that defendant received a majority of the votes cast, and does not attack the validity of those votes except to the extent that they were cast for an alleged ineligible candidate, he does not state a case entitling him to the nomination, and is therefore without interest to challenge the qualifications of defendant.

In support of this contention it is pointed out that while the Act No. 49 of 1906 provided that any candidate who "should feel aggrieved" might file a contest, the act of 1916, limits the right to a candidate "who shall claim to have been nominated." It is said that the contestant must not only claim to have been nominated, but that he must allege facts which, if proven, would entitle him to the nomination. Not only does the statute not so declare, or that the court must so find to give relief, but, if the question of his nomination were the only one the allegation of facts sufficient to support which would sustain the action, it would follow that those facts would be the only ones which could be proved, no matter how far or in what respects the primary election law might have been violated, even though, as in the case of Hart v. Picou, 147 La. 1017, 86 South.

479, all of the ballots might be void and no one nominated.

The Legislature had the power to say that any voter might initiate the contest. In the act of 1906 it said any candidate who might feel aggrieved, and in the act of 1916 any one claiming to have been nominated. It did not see fit to add the requirement that he should allege or prove facts to support his nomination, and we do not feel that the court can supply it.

If he were compelled to allege facts to sustain his nomination, it follows that he would have to prove them, and, when he had done this, he would not need to show that his opponent was disqualified.

Beyond this, when the courts are given the jurisdiction to try and determine such contests, in the unlimited terms of the act, we do not believe that the Legislature intended to or could, in view of article 209 of the Constitution and the mandatory requirements of the statute with reference to the qualifications of a candidate, which are but the reiteration of those of the Constitution itself, limit the inquiry to the question of plaintiff's nomination. It was the right of plaintiff, under both to be opposed by one qualified, and until he has been so opposed he has not had a fair contest at the hands of the voters.

We think it could hardly be said that one who was in no wise eligible, either because of his residence or of having in no sense otherwise complied with the law by filing his declaration, etc., but had induced the Secretary of State to print his name on the ticket at the last moment, would be immune to a suit of this character, even though he received a majority of the qualified votes. If so, then we might follow it a step further and say that, if the voters of a party met in mass meeting, cast their ballots on forms provided by the Secretary of State, and were able to induce him to promulgate the result, the minority candidate therein could not be heard to assail the result.

We think the petition discloses a cause of action.

### Plea of Estoppel.

[3] Counsel for appellee also contend that by entering the election with defendant, with knowledge of the facts upon which he now relies, and having taken his chances of election, plaintiff cannot be heard to question the result. If he had not been a candidate, he certainly would now have no standing to bring this contest. His only other choice was to withdraw from the race. We take it that counsel do not rely seriously upon this plea. See Hart v. Picou, supra.

### On the Merits.

[4] The facts are not disputed; the situation being that defendant claims they show a compliance with the law, while plaintiff contends they do not. Plaintiff's sole ground of complaint is that defendant is not and was not an elector because of his failure to reside within the state two years, the parish one year, and the precinct six months.

Defendant was born and reared in the city of New Orleans, and has always had his business interests, which are quite extensive, here. He was from 1909 to 1918, inclusive, judge of the Court of Appeal for the parish of Orleans. For many years he owned what was said to have been quite a handsome home on one of the principal thoroughfares of this city in the Fourteenth ward; and in 1910 also purchased what is termed a summer home at Pass Christian, Miss., which he says is worth in excess of $35,000. Thereafter, for several years, the defendant, his wife and guests occupied alternately the two places, the one in the city principally in the winter and one on the Mississippi coast mostly in the summer.

In June, 1917, while residing at Pass Christian, defendant sold his home in the

HALL v. GODCHAUX

Fourteenth ward and never afterwards returned to said ward to live. He returned to the city in the fall and went to the De Soto Hotel, which is situated in the Second precinct of the Third ward, the exact date not appearing, and obtained apartments for himself and wife. He was required by the hotel to take them for six months, and, since the lease included at least a part of April, it must have commenced towards the latter part of October or first of November.

Defendant informed the manager that it was his intention to make the hotel his home, and the rooms were renovated and arranged to suit his requirements. On the 4th of October of the year 1917 he registered in the Fourteenth ward, for the reason, as he says, that he had not been absent therefrom six months, and could not therefore register from the hotel.

Judge Godchaux had been trying for some time to obtain a place in the Red Cross service for himself and wife, which he finally did, and on the 14th of March, 1918, left for France, where he and his wife were assigned to the military forces of this country, which was then at war, and served until January, 1919, when he returned to the city of New Orleans; the Armistice having been signed and his services in France being no longer necessary.

The apartments at the hotel had been given up in April, 1918, defendant's furniture, or at least a good part of it, had been sent to his summer home in Mississippi and other portions stored, and all connection with the hotel severed, except the declaration, acquiesced in by the management, that he wanted to make it his home. When he returned in January, 1919, he registered and obtained a room, for which he paid while occupying it, being in and out of the city one or more days nearly every week, surrendering his key, and re-registering upon return just as any other guest. This condition continued until about the 1st of August, 1919, when, his wife having in the meantime returned from France to the hotel some time in the summer, defendant went to his summer home, again severing all connection with the hotel. August 6, 1919, he registered for the purpose of voting from the De Soto Hotel.

About October of the same year Mrs. Godchaux went to New York, as was her custom, and remained there until about January. While there certain relatives expressed a desire to visit them, and Mrs. Godchaux suggested that because of the heavy expense at the hotel (they having paid $150 per week for their apartments in 1917–1918) a furnished house be leased for a few months. This Judge Godchaux did, but was required to take the house from October, 1919, to October, 1920. When Mrs. Godchaux and her guests arrived in January, 1920, the family took up its residence in the house so leased, which was on Palmer avenue, in neither the Third or Fourteenth wards. Defendant's connection with the hotel in which he had been occupying a room, paying for it as it was used, as above stated, was again severed. The month of January, and possibly the month of February, was spent in this residence, known as the Bell house, when the defendant and his family went to Pass Christian, remaining there until April, again returning to the Bell place in April. In May, Mr. Bell agreed to cancel the lease, and the lessee with his family went back to the Mississippi coast. There they remained until the fall of 1920, when Mrs. Godchaux again went to New York and the judge came back to New Orleans and again occupied a room under the circumstances above mentioned, that is, while in the city, registering, being assigned a room, and paying for it as he used it.

Mrs. Godchaux returned from the East around Christmas time of 1920, and they again took up apartments at the De Soto

Hotel. There they remained through January, February, and a part of March, 1921, when the judge and his wife went to Brown's Wells, Miss., for his health, giving up the apartments, stayed there two or three weeks, and came back to the hotel for two or three days. Again relatives came to visit them the latter part of April, 1921, or first of May, and they then went to Pass Christian, where they remained to the day of the trial below and where, we are informed by the argument, they are still residing. On leaving the hotel about the 1st of May, connection therewith was again severed as before.

While residing at his summer home in Mississippi, Judge Godchaux registered as a voter of the Third ward, giving his residence as the De Soto Hotel.

The record, we think, discloses that Judge Godchaux was in good faith and that he intended to make the De Soto Hotel his voting domicile, if that were legally possible under the facts which we have outlined.

For the purposes of this case, we are relegated to the provisions of the Constitution of 1913 and the statutes passed pursuant thereto, for the reason that, by its terms, article 7 of the Constitution of 1921 does not become effective until January 1, 1922.

Article 197 of the Constitution of 1913 reads:

"Every male citizen of this state and of the United States, native born or naturalized, not less than twenty-one years of age, and possessing the following qualifications, shall be an elector, and shall be entitled to vote at any election in the state by the people, except as may be herein otherwise provided.

"Section 1. He shall have been an actual bona fide resident of this state for two years, of the parish one year and of the precinct in which he offers to vote six months next preceding the election; provided, that removal from one precinct to another in the same parish shall not operate to deprive any person of the right to vote in the precinct from which he has removed, until six months after such removal.

"Sec. 2. He shall have been, at the time he offers to vote, legally enrolled as a registered voter on his personal application, in accordance with the provisions of this Constitution, and the laws enacted thereunder."

As shown by the terms of section 9 of the act of 1916, the qualifications of an elector in a primary election are made the same as those in a general election, with additional qualifications prescribed by that act.

Hence it becomes our duty to construe what is meant by the words "actual bona fide resident," as used in the law, constitutional and statutory. We do not think it is necessary, as contended by counsel for appellee, that we should find Judge Godchaux to have been a citizen of Mississippi. Neither do we find that the petition rests upon that allegation alone, although counsel for the contestant insist that such is the status of the defendant. In articles 10, 11, and 12 the petition charges that Godchaux was not a resident of the state for two years, the parish one year, and the precinct six months next preceding the election, virtually in the language of the Constitution; and we take it that, if it be shown that because of his failure to comply with any one of these requirements he is not in law an elector, then he has been shown to be ineligible. Hence that allegation would have been sustained.

We think it can hardly be denied that the moment Judge Godchaux sold his home in the Fourteenth ward in June, 1917, while residing at Pass Christian, he commenced to lose his right to vote in that ward, even though he had remained elsewhere in the city, and at the end of six months was no longer an elector of that ward. See second clause of section 1, art. 197, of the Constitution. Admittedly, he did not take up a residence in any other ward until he returned to the city in October, 1917, and commenced stopping at the De Soto Hotel. Therefore he could not, though he remained a resident of the state and parish, become an elector in that ward (the Third) until he had

resided in it six months. Hence he undoubtedly lost his status as such some time in December, 1917 (being out of the Fourteenth ward six months, June to December), and could not have gained the quality of an elector in the Third ward until about April 1, 1918. Therefore, when he left for France on March 14, 1918, he did not possess the qualifications of an elector in any ward of the city. But granting that article 208 of the Constitution preserved and continued his residence at the De Soto Hotel while he was in France, and that he might have legally registered in the Third ward upon his return in January, 1919, provided he had again taken up an actual bona fide residence there, that constitutional reservation ceased upon his return, and he was again put to the necessity of complying with the law the same as any other citizen. The evidence, mainly of the defendant, himself, is undisputed that he never thereafter commenced or maintained any other relation to the hotel than that heretofore described of registering and paying for the rooms which he occupied while so used and surrendering them when he checked out, until the winter of 1920–21, when he took up apartments about Christmas time and retained them until some time in March, 1921.

Therefore defendant has not, by the transient and uncertain character of his stopping at the hotel other than while occupying apartments, resided at the De Soto Hotel continuously for a period of six months since his return from France in January, 1919.

[5] Unfortunately for Judge Godchaux, the law does not allow one to become an elector by constructive residence, nor is the matter controlled solely by intention, no matter how bona fide it may have been; but we are called upon to apply and interpret the meaning of the words "actual bona fide resident," and we take it that those words are to be given their ordinary meaning and significance. In the nature of things, they cannot be said to mean that he must occupy his place of abode every moment during the period of time necessary to become a resident in the sense of qualifying him as an elector; for the necessities of the case require that he should be permitted to pursue the ordinary affairs of life. However, we think that he is required to maintain such a relation with the place or premises so selected as will entitle him at his will, and without making new arrangements therefor upon each return, to occupy such place whenever his necessities or pleasure require, and this without having to ask the permission of some one else. This cannot be said to have been true of Judge Godchaux while he was stopping at the De Soto Hotel, under the circumstances which we have outlined. If so, then any one or any number of persons might, by simply declaring their purpose to establish a voting domicile at a hotel, register there, occupy a room occasionally, as their pleasure might dictate, and become lawful voters in such ward. In our opinion such a ruling would be in the very teeth of the Constitution and statute. If the individual maintains a place to which he can return, as above indicated, he does in law have an actual bona fide residence, and when away under the call of business or pleasure is an absent actual bona fide resident. But we cannot see how it can be said that he is such a resident when he possesses no other right than that of going to a hotel, registering, and being assigned a room, with no fixed relation thereto, as has been shown, to have been the case with Judge Godchaux.

Defendant relies upon the cases of Caufield v. Cravens, 138 La. 283, 70 South. 226, Estopinal v. Vogt, 121 La. 883, 46 South. 908, and State ex rel. Hodges v. Joyce, 128 La. 434, 54 South. 932, as supporting his contention. We do not think that any one of these

cases fits that of defendant. In the first case Canfield was a railroad conductor who had for many years resided, voted, paid street and poll taxes, and in every way maintained his identity with the town of Wilson, in the parish of East Feliciana. He found it necessary to send his wife and children to the city of Baton Rouge for the purpose of educating the latter, rented a house, and established them there for that purpose. His duties included runs on several different branches of the same railroad, but he was required to report at Wilson, where he had always resided, for the purpose of obtaining orders and assignments for his different runs. When in Wilson he sometimes stopped at a place called the Valley Hotel, and always occupied one of the two rooms, Nos. 2 and 5, set apart for conductors, for which he paid 25 cents per night. And at others he stopped at the home of his father-in-law, for which he paid board. But he did have the privilege at all times of occupying these same quarters. He was, presumably, a man of limited means, and did not maintain a separate domestic establishment to be occupied by no one but himself. His situation was dictated by necessity, and not by choice, but he did maintain a fixed place of abode in the sense and to the extent which the circumstances permitted. In the present case no such condition obtained, and the defendant's action was controlled solely by choice and was supported purely by intention while away from the hotel. The Canfield Case, we think, goes as far as could be done in view of the necessities of his situation; but we do not feel justified in going to the extent which we are asked to do in this case.

With reference to the Vogt Case, the citation is probably erroneous, and counsel no doubt intended to cite Estopinal v. Michel et al., on page 879 of the same report (121 La.), 46 South. 907, 19 L. R. A. (N. S.) 759. In the latter case the defendants, whose right to vote was challenged, were bar pilots who kept their families in the city of New Orleans, but who resided at Pilot Town, in Plaquemines parish, while discharging their duties as bar pilots. They did have a place there known as the "barracks," which they jointly maintained and occupied, but each had the unqualified right to occupy the same as he saw fit.

In the Hodges Case the evidence showed that one Cannon, who had reached his majority in February, 1911, went for a short while to the state of Mississippi and worked on a railroad, but soon returned and took up his residence again in the same place. The court found his absence was only temporary, and that he still had this home or residence to which he could return, although it was a box car. We do not think the case sustains the defendant's contention.

We conclude that defendant was not an elector under the Constitution and laws of this state, in that he was not an actual bona fide resident of the Second precinct of the Third ward of the city of New Orleans at any time subsequent to January, 1919; hence he is precluded from receiving the nomination for the place which he seeks.

Plaintiff contends that we should not consider the votes cast for Judge Godchaux, and that he should be held to be the nominee because he received a majority of the remaining votes. However, this is contrary to the ruling of the national Congress and the courts of all the states of the American Union, with the exception of Indiana; although in England it has been held that where the voters had knowledge of the ineligibility of a candidate votes for him would be disregarded and the next highest candidate declared elected. Even if we were to consider the question of notice, which we cannot in this case, it consisted merely of a newspaper controversy between the candidates, and the voters had the right, in these circumstances,

to assume that those charged with the responsibility of seeing that the law had been complied with had done their duty. They were lawful voters, entitled to vote for an eligible candidate, and we cannot declare one the nominee who has not received even a plurality of the lawful votes.

We conclude that the nomination of defendant will have to be set aside. Hart v. Picou, 147 La. 1017, 86 South. 479.

For the reasons assigned, the judgment appealed from is annulled and set aside, and it is now ordered, adjudged, and decreed that the nomination of the defendant, Emile Godchaux, be annulled, and the primary election set aside and held to have been without effect as far as the nomination of a successor to the Chief Justice is concerned. Defendant, appellee, is to pay all costs.

PROVOSTY, OVERTON, and PORTER, JJ., dissent and reserve their right to file written reasons.

OVERTON, J. (dissenting). Without entering into a discussion of the exceptions urged by the defendant, Mr. Justice PROVOSTY, Judge PORTER of the Court of Appeal, who sat as a member of the court in this case, and the writer of this opinion dissent from the decree rendered by the majority, and hold that defendant, at the time of the primary, was an elector of the Second precinct of the Third ward of the parish of Orleans, and eligible to the office of Associate Justice of the Supreme Court from the First Supreme Court district, for the following reasons, to wit:

Defendant was born in the city of New Orleans and was reared there. When he attained manhood he selected as his profession the law, and upon his admission to the bar he practiced his profession, and continued residing in that city. Later in life he was appointed a member of the Court of Appeal for the parish of Orleans. When he married he secured an apartment at the St. Charles Hotel, which he made his home. Afterwards he acquired a lot on St. Charles avenue, and there built a handsome residence. While residing on St. Charles avenue, and while still a member of the Court of Appeal, he purchased a summer home at Pass Christian, Miss., which he afterwards donated to his wife. After he acquired the summer residence, and while still a member of the Court of Appeal, when summer came he spent the summer there, whenever in the South, and upon the return of autumn he returned to his permanent abode on St. Charles avenue.

While spending the summer at Pass Christian, in June, 1917, he sold his home on St. Charles avenue, and settled with certain mortgage creditors. When autumn came, which was the time for his return to his native city, which during all of his life had been his home, he went to the manager of the De Soto Hotel, located in the Second precinct of the Third ward of the city of New Orleans, and told the manager that he had sold his residence and desired to make his home at the hotel. The manager complied with this request, and a contract of lease was entered into, by which an apartment in the hotel was leased to defendant from October 1, 1917, till April 1, 1918. This apartment was renovated by the hotel to satisfy defendant. A small part of the furniture that he had in his St. Charles avenue residence was moved to this apartment; the greater part was sold, and still another part was sent to his summer home at Pass Christian.

On October 1, 1917, defendant and his wife moved to the apartment that he had leased, and remained there till March 14, 1918, on which date, they, in accordance with a strong desire to be of as much assistance as possible to their country in the recent war, left for France in the service of the Red Cross. In the early part of January following, the Ar-

mistice having been signed, he returned to the De Soto Hotel, his wife still remaining in France. When he reached the hotel he registered, and, being alone, took a room, instead of an apartment. While in France he declined the renomination by his party as a judge of the Court of Appeal, and hence upon his return formed a partnership, in New Orleans, for the practice of his chosen profession. Among his clients was an oil company in Shreveport. This necessitated his going there quite often during that period, sometimes for two days, and occasionally for several days. In August following, his wife returned from France to the De Soto Hotel, from which place, after a day or two, it being summer, they went to their summer home at Pass Christian. In October she went on a visit to relatives in the East, and he returned to the hotel, where he registered and was assigned a room. While there he received a letter from his wife, advising him that she had invited relatives to spend a part of the winter with them, and that, because of the expense in securing an apartment, it would be preferable to lease for a short time a house already furnished. Defendant, deeming, under the circumstances, that it would be advisable to adopt this suggestion, undertook to secure such a house for a short period. He, however, found that he could not secure a suitable one for less than a year, and accordingly leased one, already furnished, on Palmer avenue, in a different ward of the city of New Orleans from that in which the De Soto Hotel is located. Defendant remained at the hotel till the early part of January, 1920, when his wife and her relatives arrived, at which time they went to the house on Palmer avenue. They remained there during most of the month of January. Towards the close of that month the visiting relatives, desiring to stay awhile on the coast, went with defendant and his wife to the residence at Pass Christian, and

remained there till some time in April, and then returned to the house on Palmer avenue. Defendant and his wife remained there till May, when, it being satisfactory to the lessor and lessee, the lease was canceled for the remainder of the term, and they, according to the best of defendant's recollection, went back to the De Soto Hotel, where they remained for a day or two, and then went to Pass Christian for the summer.

In October following, his wife again visited relatives in the East, and he returned to the De Soto Hotel, where he secured a room. He remained there, with the exception of the short and temporary absences hereinafter mentioned, till about the 1st of January, 1921, when he was joined by his wife. They were then assigned an apartment in the hotel, upon his application, and remained there for about three months, when they surrendered it, and, on account of defendant's health, went to Brown's Wells, Miss., for two or three weeks. Expecting relatives from the East, they returned, and, according to the best of defendant's recollection, stopped at the De Soto Hotel for a day or two, and upon the arrival of their guests all went to Pass Christian. After the departure of the the relatives they remained there for the summer, and, as the summer has not yet passed, they are still there.

At those times when defendant's wife was not with him and an apartment secured, he engaged a room. When alone and called off on business for two or more days he surrendered his room, expecting to get the same one or another upon his return, and always expecting to return. These temporary absences were of short duration. On these occasions, on returning, he registered again and was assigned the same room, when possible, or else another. At no time did he fail to secure one. Likewise when he left for the summer he surrendered, each time, his apartment, and had to rearrange for another the next winter.

Defendant is interested in various business concerns in New Orleans and has been for some years. He has, without exception, described himself, in all written contracts executed by him, during the period in question, and doubtless prior thereto, as a resident of New Orleans. It is true that in a social directory his address was given as being Pass Christian, but whatever effect this would otherwise have, if any, defendant had no knowledge of the fact until the day of trial. The same is substantially true as to a city directory in which his address is given as being on Palmer avenue.

Prior to his departure for France defendant registered as a voter from the Fourteenth ward, because he had not been in the Third ward for the required six months, and the only ward in which he could vote, under the Constitution, until the expiration of six months following his removal, was the ward in which he had lived, and from which shortly before he had removed. After his return from France, defendant registered from the De Soto Hotel, as a voter of the Second precinct of the Third ward of New Orleans, being the precinct in which the hotel was located. During the present summer, in due time, prior to the primary election, he again registered from the De Soto Hotel, as a voter of the precinct just mentioned. In fact, defendant has never voted elsewhere than in the city of New Orleans.

From the foregoing statement of facts, it will appear that defendant at no time entertained an intention of surrendering his domicile in his native city, in which, since manhood, he has formed part of its social and professional life. The only domicile that he has claimed, for the past several years, has been the De Soto Hotel. Therefore, if his occupancy of the hotel was of such nature as to make him a resident thereof for the required time, then he should be considered a qualified elector and eligible to the office to which nominated.

Section 9 of Act No. 35 of 1916 prescribes the qualifications for a candidate in a primary election. The Legislature there provides that these qualifications shall be the same as those provided by the Constitution and election laws of the state for voters at general elections, with such additional qualifications as may be prescribed by the candidate's party. Article 197 of the Constitution of 1913, which article remains in force for the present year, requires that for one to be a voter "he shall have been an actual bona fide resident of this state for two years, and of the parish one year and of the precinct in which he offers to vote six months next preceding the election." Section 2 of the same article provides that he shall be at the time he offers to vote a legally enrolled and registered voter. Other requirements are prescribed by this article, but it is unnecessary to mention them, as they are not in question, unless it be that of citizenship of the state. It is clear that he is a citizen.

While the article of the Constitution, cited above, requires that the person offering to vote shall be an actual and bona fide resident, yet the word "actual," as here used, cannot, in the nature of things, be construed to mean that one, claiming to be such a resident, cannot temporarily leave his dwelling, or the precinct in which he resides, without failing to secure or forfeiting his right to vote. Such a construction would be so burdensome and intolerable that it is clear the framers of the Constitution did not intend it, but intended that the phrase should be so interpreted as to admit of temporary absences. Caufield v. Cravens, 138 La. 283, 70 South. 226.

When defendant went to the De Soto Hotel, after the sale of his residence, and advised the manager that he desired to make his home there, no sufficient reason suggests itself, or is advanced, to question his good faith. When he moved into the apartment, which he had leased for six months, he estab-

lished his domicile there. His intention is made clear by the above declaration and by the convincing evidence that he had no intention of surrendering his status as a resident of New Orleans. After he had lived in this apartment for 5½ months, he required, on leaving for France, only half a month more to acquire the right to vote in the second precinct of the Third ward, in so far as residence is concerned. When he left, he still retained the apartment, under his contract, till April 1st. In addition, his residence, in respect to his right to vote in that precinct, was expressly reserved to him by article 208 of the Constitution of 1913. This article provides, in part, that no person shall be deemed to have lost his residence by reason of his absence while employed in the military service of the state or of the United States. Therefore, when he returned from France some 8½ months afterwards, he had a right to register and vote from the De Soto Hotel.

But, in the view of the majority of the court, if he at that time acquired a voting domicile there, he afterwards lost it, and did not again reacquire it. This depends upon whether he lost his residence there by the manner in which he occupied the hotel. It is true that, when he left it for two or three days, on those occasions when he did not have apartments set aside, he surrendered his room, and did likewise as to the apartment towards the approach of summer, and in the early spring of 1921, when he left for two or three weeks for Brown's Wells, because of his health.

It should be observed, however, that these departures were purely temporary. Each time he left he returned, true to the declaration made in the beginning to the manager, and true to his declarations of residence made in the various contracts he signed. It is not understood that the majority view questions his intention to make his domicile there, but the sufficiency of his occupancy of the hotel as a residence.

In respect to his failure to retain rooms or apartments in the hotel during his absence, which the majority opinion stresses, the minority are unable to take the view that the retaining of rooms was necessary under the circumstances of this case. He surrendered them evidently for economic reasons. They were of no service to him during his absence. He had reasonable grounds to believe that he could secure the same, or others, in the hotel. There was an understanding that he could make the hotel his home. The retention of rooms during an absence is only a circumstance bearing on the intent to return. It has been seen that, notwithstanding the requirement is that the one claiming the right to vote must be an actual bona fide resident, yet that it is contemplated that he may temporarily leave for reasonable periods. During such temporary absences the retention of rooms, where the intention to return is clear, should not be held necessary.

In so far as concerns the leasing of the furnished home to entertain his wife's relatives, the recital of the facts shows that this was a mere temporary arrangement entered into for economic reasons. The house was occupied for only about 2½ months, and was given up at the first opportunity.

The case of Caufield v. Cravens, 138 La. 283, 70 South. 226, is applicable to the present case. In that case the plaintiff, a railroad conductor, established a domicile at Wilson, La. When the time arrived to begin sending his children to school he leased a house in Baton Rouge and sent his family there. He had no intention of changing his domicile. His purpose was merely to secure better schooling for his children. After the removal of his family he continued to pay his poll tax and to vote in Wilson. After his family left he did not maintain there a do-

mestic establishment. In the course of his duties he was required to report and get his orders at Wilson. His train passed through, stopped at, and started from Baton Rouge and Wilson, except at times, when they touched neither point. When he stopped at Wilson he lodged in a hotel in rooms set apart for conductors, or else at his father-in-law's. During vacation the wife and children visited her mother at Wilson, or his father in Mississippi.

The court held that defendant was an actual bona fide resident of Wilson, and in passing on the case said:

"In State ex rel. Hodges v. Joyce, 128 La. 434, 54 South. 982, it was held that a person living at Ferriday (in this state) in a stationary box car (with an older brother who was a car inspector), but who had gone to Mississippi under employment there, who 'frankly testified that he expected to remain in Mississippi as long as he could hold his present job, but would return to his home at Ferriday if he lost his job, or got sick, or could obtain a better job in Louisiana,' who had left his trunk and part of his clothing in Ferriday, and who had no other abode in this state, was 'an actual bona fide resident of Ferriday,' since he had acquired a residence there, and had not changed, or intended to change, it, which ruling is in accordance with the generally accepted doctrine that a domicile once gained remains until another is acquired, and that, where the question is in doubt, the original domicile is to be considered the true one. McCrary on Elections, appendix, p. 462; A. & E. Enc. of Law (2d Ed.) vol. 10, p. 598; State v. Savre, 129 Iowa, 122, 105 N. W. 387, 3 L. R. A. (N. S.) 455, 113 Am. St. Rep. 452; Gravillon v. Richards' Ex'r, 13 La. 293, 33 Am. Dec. 563."

For these reasons, we respectfully dissent from the decree entered by the majority of the court.

PROVOSTY and PORTER, JJ., concur in this dissenting opinion.

PROVOSTY, J. (dissenting). Not every citizen may maintain a suit to contest the validity of an election, or to contest the official tenure of the incumbent of a public office. Too much uncertainty would be brought into elections and too much disturbance in the administration of public affairs, if such a thing were allowed. Hence the Code of Practice says of the writ of quo warranto:

"Art. 868. This mandate is only issued for the decision of disputes between parties in relation to the offices in corporations, as when a person usurps the character of mayor of a city, and such like.

"With regard to offices of a public nature, that is, which are conferred in the name of the state by the Governor, with or without the consent of the Senate, or by election, the usurpations of them are prevented and punished in the manner directed by special laws."

And section 12 of article 8 of the Constitution provides that—

"The Legislature shall provide by law for the trial and determination of contested elections of all public officers."

The only provision of law authorizing a citizen to contest a primary election is section 6 of the Primary Election Law (Act 210, p. 344, of 1920), which provides that "any candidate * * * who shall claim to have been nominated" may thus contest.

The petition of the plaintiff shows that a very large majority of the good votes cast at the election were not for him but for the defendant. Therefore it shows that he cannot claim to have been nominated; that he therefore does not come within said statute. The petition therefore does not show that he has a standing for contesting the election, or, in other words, that he has a cause of action.

Very true, the petition contains also the allegation that plaintiff claims to have been nominated; but, manifestly, this allegation is merely the allegation of a conclusion of law drawn by plaintiff from the alleged facts which show the very contrary, and the question of whether a petition shows a cause of action or not is to be determined, not from the conclusions of law the plaintiff

may choose to allege, but from the facts which he alleges.

On the point of what is meant by "claim to have been nominated" the following authorities are apposite:

Words and Phrases, First Series, vol. 2, p. 1204, defines the word "claim"—

"'Claim,' in its primary meaning, is used to indicate the assertion of an existing right. In its secondary meaning it may be used to indicate the right itself. Appeal of Beach, 55 Atl. 596, 599, 76 Conn. 118."

And the same work (Second Series, vol. 1, p. 722) states:

"As cause of action or defense.
"The word 'claim,' as used in Laws 1895, c. 95, § 1, which authorizes one having a claim against the state to sue thereon, is synonymous with 'cause of action.' Riddoch v. State, 123 Pac. 450, 451, 68 Wash. 329, 42 L. R. A. (N. S.) 251, Ann. Cas. 1913E, 1033."

And again (page 725):

"In common speech a person 'claims' the land to which he has title, meaning by his claim of title to declare ownership, and such an expression, used in a pleading, means an assertion of title, and is equivalent to an allegation that the plaintiff has title to the land. Dugas v. Hammond, 60 S. E. 268, 269, 130 Ga. 87, citing Stand. Dict.; Marshall v. Shafter, 32 Cal. 176."

In State ex rel. Clawson v. Bell, 169 Ind. 61, 82 N. E. 69, 13 L. R. A. (N. S.) 1013, 124 Am. St. Rep. 203, the court said:

"The claim to the office which the relator asserts under the facts as alleged in his complaint, and as shown by the evidence, cannot be held to be such an interest therein or thereto, within the meaning or contemplation of the statute, as will authorize him to become the relator in this case. The interest claimed must be shown to be such as will, in the eye of the law, give him a standing in court to maintain the action. State ex rel. Hatfield v. Ireland, 130 Ind. 77, 29 N. E. 396; Reynolds v. State, 61 Ind. 392; 15 Cyc. 406. At the election in question he neither received a majority nor plurality of the votes cast by the electors of Henry county for county assessor, while, in fact, appellee appears to have received a large majority of the votes cast for that office. Under the facts, in our opinion, the relator falls far short of establishing any legal right to or interest in the office. * * *"

Citations to the above effect could doubtless be multiplied. Nothing contra can be found. These authorities are conclusive to the effect that what is meant by the expression "any candidate who may claim to have been nominated" is any candidate who may make a showing of having received the nomination.

In final elections the law formerly allowed "any candidate" to contest. Section 1419, R. S. But the petition had to be "signed by at least ten qualified electors." Section 1433. And the jury might "refer the same again to the people." Section 1422. This was changed by Act 24, p. 27, of 1894, to "any candidate * * * that may claim to have been elected," coupled with the same requirement that the petition be "signed by at least twenty voters." Under the Corrupt Practices Act any defeated candidate may contest. Section 38 of Act No. 213 of 1912. The first Primary Election Law made no provision for contest. The Primary Election Law of 1906 (section 25 of Act 49, p. 66, of 1906) provided that "any candidate [who] should feel aggrieved" might contest. The present Primary Election Law (section 25 of Act 35, of 1916, and Act 210, p. 344, of 1920) changed this to "any candidate * * * who shall claim to have been nominated." No requirement that the petition be signed by voters. In State v. Mason, 14 La. Ann. 505, this court held that "no one but a person pretending to have a right to the office should be permitted to contest." In State ex rel. v. Foster, Judge, 111 La. 1087, 36 South. 200, the syllabus reads:

"The courts of this state are without jurisdiction to entertain an action contesting the validity or result of a primary election, in the absence of express statutory authorization."

This court has repeatedly so announced, and no one contests the proposition; so that

the question involved on the present exception of no cause of action is simply as to whether, in order to come within the statutory provision hereinabove quoted, it suffices simply to claim to have been nominated, no matter how much the claim so made may be contradicted, refuted, and nullified by the facts alleged in the petition. When the claim of having been nominated is thus made in a petition which shows facts to the contrary, the legal situation is that the petitioner says to the court that he cannot claim to have been nominated but that he makes anyhow the claim that he was.

It strikes me that the argumentation of the majority opinion amounts to saying that, because the courts have jurisdiction to try the issue of the validity of the election, therefore the plaintiff is the proper person to present that issue to the court. Whereas nothing is better settled in jurisprudence than that in the absence of express statutory authorization no one may maintain such a suit except the state.

"The right to contest an election is not a natural right, but exists, if at all, in the Constitution or statutes." 20 C. J. 222.

A plaintiff may contest an election for the purpose of having himself declared to have been nominated or elected; beyond this the affair does not concern him. If the election is for any reason null, the affair is that of the state. To take the illustration given by the majority opinion: If a mass meeting were to nominate a candidate, and the Secretary of State were to promulgate him as having been duly nominated, neither the present plaintiff nor any other citizen could meddle in the matter, unless upon alleging facts showing that he, and not the promulgated person, was entitled to the nomination.

It is noteworthy that the Primary Election Law originally read, "Any candidate who feels aggrieved shall have a right to contest," and that in the amendment of 1920

(Act 210 of 1920, supra), this was changed to, "Any candidate * * * who shall claim to have been nominated"—thus restricting to one who is claiming to have received the nomination the right to contest.

The learned counsel for plaintiff contend that the votes cast for the defendant must be disregarded altogether, as having been cast for an ineligible candidate, and to that effect is the English rule, whenever the ineligibility of the candidate was known to the voters; but the American rule is to the contrary, and, as I understand, my colleagues agree with me that the American rule governs. And, besides, how could the voters have known in the present case that the defendant was ineligible when the judges who have considered the case (counting the trial judge as one) stand four to four on that question?

In the case of Hart v. Picou, cited by the majority opinion, this court annulled an election at the suit of a private citizen; but the question of the right of a private citizen to stand in judgment on such a demand was not raised in that case and was not passed on by the court.

In Commonwealth ex rel. McLaughlin v. Cluley, 56 Pa. 270, 94 Am. Dec. 75, where the statute provided that writs of quo warranto "might be issued upon the suggestion of any person or persons desiring to prosecute the case," the court refused to entertain the suit of a defeated candidate, holding:

"Votes cast at election for person who is disqualified from holding office are not nullities; and where, at an election for sheriff, a majority of the votes are cast for a disqualified person, the minority candidate is not to be returned as elected.

"Relator in quo warranto has no interest when he is the next in vote at an election for sheriff, where the person receiving the highest number of votes and returned was disqualified. He has no more interest than any other inhabitant of the commonwealth. The question of his right to the office is a public one exclu-

sively, and can be raised only by the Attorney General. * * *

"This court has construed the words 'any person or persons desiring to prosecute the same' to mean any person who has an interest to be affected. They do not give a private relator the writ in a case of public right involving no individual grievance. This was ruled in Commonwealth v. Allegheny Bridge Co., 20 Pa. St. 185, in Murphy v. Farmers' Bank, 20 Id. 415, and Commonwealth v. Railroad Co., 20 Id., 518."

The fact that a private citizen was a candidate at the election does not endow him with any right he would not otherwise possess to contest the election. His right to contest, whether he has been a candidate at the election or not, is to be measured by the words of the statute conferring the right upon him. In the absence of any statute on the subject he would be without any right at all. In fact, in the absence of express constitutional or statutory authorization the very courts themselves are without jurisdiction to entertain election contests. All the decisions, and they are numerous, are to that effect. And the fact that a citizen has made a deposit of money with the Secretary of State for being allowed to enter a primary confers no right upon him to contest in court. In the words of the statute, this deposit is required only "as an evidence of good faith," and is to be returned to the candidate if his good faith eventually appears by his receiving 10 per cent. of the votes cast at the election. The plaintiff in the present case having received more than that proportion of the votes, his deposit is returnable to him, and hence he stands as if he had not made it.

I therefore respectfully dissent from the majority opinion on the exception of no cause of action, and on the merits I concur in the dissenting opinion prepared by Mr. Justice OVERTON.