NAPIER, APPELLEE, *v.* BANKS; BUCKEYE UNION CASUALTY CO., APPELLANT.

(No. 433—Decided April 24, 1969.)

*Mr. Thomas J. Finneran* and *Messrs. Volkema, Redmond & Post,* for appellee.
*Mr. Roger C. Stridsberg,* for appellant.

KERNS, P. J.   This is an appeal on questions of law from a judgment of the Court of Common Pleas of Madison County.

On December 26, 1960, the defendant, Dolores Banks, was involved in an accident which resulted in a substantial judgment against her. At the time, she was operating a 1957 Plymouth owned by her father, Frank Pennington, who carried insurance with Nationwide Mutual Insurance Company.

However, the primary bodily injury coverage of Na-

tionwide was insufficient to satisfy the judgment obtained by the plaintiff, William J. Napier, and he proceeded by supplemental petition against the defendant-appellant, Buckeye Union Casualty Company, alleging that Buckeye had a policy of insurance on a 1954 Cadillac owned by Dolores Banks, which also covered the operation of the 1957 Plymouth being driven by Mrs. Banks at the time of the collision.

Under the liability provisions of the policy issued by Buckeye to Dolores Banks, the company agreed to pay, on behalf of the insured, all sums which the insured might become legally obligated to pay as damages because of bodily injury arising out of the ownership or use of the owned automobile or any "non-owned automobile."

A "non-owned" automobile, according to the insurance policy, is an automobile "not owned by or furnished for the regular use of either the named insured or any relative," and "relative," as defined in the policy, means "a relative of the named insured who is a resident of the same household."

Hence, the critical issue in this case is whether Dolores M. Banks and her father, Frank Pennington, were *residents of the same household* within the intent and meaning of that language as used in the policy issued by Buckeye.

In this regard, the evidence discloses that Dolores Banks was married to one Liberty Banks and lived separate and apart from her parents for some years. She was divorced from her husband on September 11, 1959. At and immediately prior to that time, she resided with her three children in a rental property owned by her aunt and located some distance from the family home. Mrs. Banks worked in Columbus, some thirty miles away, but, after the divorce, she encountered financial difficulties.

In November 1960, she stored all her furniture and moved from the rented house to the residence of her parents along with her two-year-old son, Thomas. At that time, the two older children were with their father in Cincinnati. The defendant, Banks, took clothes and toys with her when she moved to the family home, and she was pro-

vided an upstairs room by her parents, Mr. and Mrs. Pennington.

With reference to her intentions, Mrs. Banks testified as follows:

"Q. How would you describe the period you were eating and sleeping in your parents home? A. Well, it was a tentative place to stay, like a stopover, until I found something I really wanted. I couldn't be taking something that wouldn't suit my budget for the necessary place to get back and forth to work.

"Q. What was your intention, then, when you did leave your aunt's house? A. Well, my intention was, as soon as I found something; why, I would take it, make things easier for myself and, like I said, I would move to Columbus."

Frank Pennington, her father, testified as follows:

"Q. When she moved into your home with your household she did not move all of her furnishings, isn't that correct? A. She didn't move any furniture.

"Q. What was she going to do with the furniture? A. Well, she stored it down on a place on 42 until she made her mind what she was going to do.

"* * *

"Q. What do you mean by 'what she was going to do'? A. Well, if I understand it right, why, she was as soon as she could find an apartment rather than to keep driving back and forth, why, her and her son was going to move to Columbus."

The defendant, Banks, sustained injuries in the accident on December 26, 1960, and did not actually move to Columbus until the spring of 1961. After the accident, her youngest son was removed to the custody of his father in Cincinnati.

The evidence discloses further that the Plymouth owned by Mr. Pennington was not furnished for the regular use of Mrs. Banks, but that it had been used "interchangeably" during her stay at the Pennington home. She testified that she used the Plymouth on the day of the accident because it was parked in a driveway in a more accessible position then her own automobile.

In the light of these facts, the phrase, "resident of the same household," has produced an interesting play upon words, and, admittedly, each party to the action has been reasonably successful in adapting the facts to their respective views of the language employed in the contract.

The manifest purpose of the restriction upon the use of "non-owned automobiles" was to protect the insurer from a situation where an insured would pay for but one policy and be covered while regularly driving other automobiles owned by members of his family. However, the purpose of the provision is obscured in the present case by the company's definition of the word "relative," which limits applicability to relatives who are residents of the same household.

We likewise fail to perceive any valid reason to dwell at length upon the word "resident" as used in the language under consideration. This word undoubtedly has a variety of meanings in law depending upon its use, but regardless of the meaning ascribed to it in Buckeye's policy, there can be no doubt that Dolores Banks and Frank Pennington were, as a practical matter, residents of the same physical structure on December 26, 1960.

However, it is equally clear that a house can, and frequently does, provide room for any number of households. In fact, this very case would present no serious challenge if Mrs. Banks and her son and Mr. and Mrs. Pennington had occupied separate units in a multiple-family dwelling at the time of the accident. Hence, in accepting and applying the argument of the defendant-appellant, that the policy must be given its "ordinary and commonly accepted meaning," the word "household" cannot reasonably be equated with the word "house."

It follows that the key words in the phrase are "same household." The "same household" necessarily involves but one household, and, ordinarily, the word "household" is synonymous with "family."'

Consequently, the question raised here, in more refined form, is whether the Pennington house was occupied by one or two families on December 26, 1960.

In our opinion, the evidence amply supports the view

of the trial court that two separately identifiable families were living in the Pennington home on the date in question.

The relatively brief period of occupancy preceding the accident and the temporary nature of the arrangement, when coupled with all other circumstances attending the move from the rented property to the Pennington abode, militate against a finding that there was any such merger of the two families as would make Dolores Banks amenable to the exclusionary provisions of the insurance policy. In fact, other than the relationship of the parties, the record fails to reflect any of the usual characteristics associated with the same household or a single family.

In passing, we note that the briefs of the parties to this action tend to disclose another patent weakness in Buckeye's case. Each side has ably and resourcefully explored the language of the policy, and each has arrived at an entirely plausible, but different, conclusion. This, in and of itself, shows that the words used in the contract are subject to dual interpretation, and any such ambiguity must give way to the fundamental rule that insurance contracts are construed against the companies that write them. In other words, where the meaning of an insurance policy is susceptible of two reasonable constructions, it should be construed in favor of the policyholder.

Accordingly, the judgment of the Common Pleas Court will be affirmed.

*Judgment affirmed.*

SHERER and CRAWFORD, JJ., concur.