ALLSTATE INSURANCE COMPANY *v.* SEEDHOUSE

[Cite as Allstate v. Seedhouse (1979), 61 Ohio Misc. 1.]

(No. 990130—Decided June 15, 1979.)

Court of Common Pleas of Cuyahoga County.

*Mr. Stanley S. Keller,* for plaintiff.

*Mr. Clayton E. Brelo,* for defendant.

I.

McMANAMON, J. This cause is before the court on a complaint for declaratory judgment.

Allstate Insurance Company insured Robert John Seedhouse, Jr., by means of a policy of automobile insurance containing an uninsured motorist provision. On or about December 23, 1977, Jeffrey Michael Seedhouse was a pedestrian on Brookpark Road in the city of Brook Park when he was allegedly struck by a hit-skip automobile which left the scene of the accident. Jeffrey has made a claim under Robert's policy for alleged bodily injury.

Robert, the named insured, was at all times pertinent to this lawsuit, a teacher in the Cleveland Public School system,

a graduate of Ohio University, and a graduate student at Cleveland State University. Prior to July 1977, he lived by himself in a small apartment which he rented for $104 per month. Features of the apartment included one bedroom with no closet, a living room, a dinette which seated three persons, and a hall clothes closet.

In July 1977, Robert's first cousin, defendant Jeffrey, arrived at Robert's apartment following some preliminary family discussion. Jeffrey, unlike his more stable cousin Robert, was a young man evidencing no particular purpose in life, whose total possessions consisted of a guitar, a toothbrush, and a few articles of clothing. Jeffrey was looking for a place to live. He had returned from a stay in Florida to find his parents were sojourning in Maine, having closed their house in the Cleveland area. The trial testimony indicates that, because of a parental disapproval of his lifestyle, residence with them was undesirable as far as Jeffrey was concerned.

Robert believed that he could help Jeffrey "get it together" and invited him to move his possessions into the apartment, making the living room couch available to Jeffrey for a bed. Robert made no request for rent or contribution toward rent or living expenses then or at any time thereafter. Jeffrey lived in the apartment from July 1977 to December 23, 1977, when he was hospitalized as a result of the accident on which his claim against plaintiff company is based. Some time before the accident, Jeffrey's parents returned from Maine, but Jeffrey chose to remain with Robert.

Robert counselled his cousin about finding employment and "not fooling around". Jeffrey was not successful in obtaining more than part-time jobs, including two out-of-town trips with a mover in August and September of 1977. At all times, Jeffrey left his possessions at Robert's apartment and returned there from the job. His mail was delivered to the apartment and it was to the apartment he returned after a brief stay in the Brooklyn City Jail.

Robert was distressed about Jeffrey's incarceration and "wanted Jeffrey to get ahead". Robert set no time limitations on sharing his apartment with Jeffrey. Although Robert's confidence in Jeffrey's ability to secure permanent employment had diminished, Robert had no intention of "kicking

him out" even when and if Jeffrey did find a permanent job. As for Jeffrey, he was apparently content to stay on with his avuncular cousin until some halcyon day when he had "a job and money" and indeed, five months passed with no such prospect in sight.

## II.

The relevant portions of plaintiff's policy regarding uninsured motorists coverage provide:

"1. *"insured"* means:

"(a) the named insured as stated in the policy, the spouse of any such named insured and relatives of either, while residents of the household;***"

Although the uninsured motorists section is silent as to the definitions of named insured, relative or resident, the liability section of the policy defines these terms as follows:

"(b) *'named insured'* means the individual named in the declarations, and his spouse if a resident of the same household; and

"(c) *'relative'* means a relative of the named insured who is a resident of the same household.
"***

"3. Miscellaneous
"***

"(e) *'resident'* or *'reside'* means, when used with reference to the named insured's household, bodily presence in such household and an intention to continue to dwell therein. However, the named insured's unmarried and unemancipated children, while away from his household attending school or in the military service, are deemed to be residents of his household."

There is no question but that the Seedhouse first cousins are "relatives," the policy having specified no limitation as to degree of kinship. The real question before the court is the meaning of the policy definition of "resident" or "reside" and the application of these terms to the living arrangements of the cousins Seedhouse.

Counsel for plaintiff company has argued that the cousins formed two separate households and for that reason the policy is inapplicable to their situation. Plaintiff's counsel postulates that "household" and "family" are synonymous. There can be no doubt that the cousins resided together in the

same tiny apartment. However, the diminutive size of the apartment and the fact that Robert carried the key to it (it was the only key he possessed) are facts which do not negate that whatever space was available was freely provided Jeffrey and that he was welcome to live there indefinitely at no cost.

### III.

It is the relationship of the cousins in the apartment that can be construed to create a household. Robert made a home for his young cousin to share the roof he could provide him, to give him counselling and example, and to attempt to change his lifestyle. Jeffrey was, in fact, made a part of the household by his cousin Robert. Evidence of Robert's informal habits, that he did not cook or eat at home, that he was not a fussy housekeeper, and that Jeffrey heated frozen foods and did not do much housecleaning does not mandate an interpretation of two separate households. To do so would be to disregard the realities of American lifestyles, their informality, the use of so-called "fast-foods" and, as was evidenced in this case, a youthful spirit of love and concern for others. Robert had no intention to put Jeffrey out, whether he found a job or not; Jeffrey had no intention to leave until his ship came in, a vague and remote possibility. As Robert stated, he "thought he could help" Jeffrey and, in so extending himself, the court finds Robert made Jeffrey a part of his household.

In summary, the evidence indicates Jeffrey was welcome to reside at Robert's, his possessions were there, and it was to Robert's that Jeffrey was free to return from work and travel.

"To be considered a resident of a particular place, it is only necessary that a person 'maintain such a relation with the place or premises so selected as will entitle him at his will and without making new arrangements therefor upon each return, to occupy such place whenever his necessities or pleasure require, this without having to ask permission of someone else.' " *Hall* v. *Godchaux* (1921), 149 La. 733, 90 So. 145, cited in *Fielding* v. *Casualty Reciprocal Exchange,* (La. App. 1976), 331 So. 2d 186, at page 190.

Counsel for both sides have cited *Napier* v. *Banks* (1969), 19 Ohio App. 2d 152, in support of their arguments. The facts in *Napier* involve an accident to a woman in the throes of ad-

justment to a recent divorce, who had been put up by her parents as a "stopover" for about one month, and who was determined, and this court believes, properly, to be a non-resident of the parental household.

This court, however, finds the next to the last paragraph of *Napier*, at page 156, to be applicable to the case at bar:

"Each side has ably and resourcefully explored the language of the policy, and each has arrived at an entirely plausible, but different, conclusion. This, in and of itself, shows that the words used in the contract are subject to dual interpretation, and any such ambiguity must give way to the fundamental rule that insurance contracts are construed against the companies that write them. In other words, where the meaning of an insurance policy is susceptible of two reasonable constructions, it should be construed in favor of the policy holder."

WHEREFORE, this court finds that the policy of insurance issued by plaintiff to Robert J. Seedhouse, Jr., provided uninsured motorist coverage for the injuries sustained by defendant when he was struck by a "hit-skip" driver while standing as a pedestrian on Brookpark Road.

This court further finds that defendant is an insured as that term is defined and used in Section II of the automobile policy issued by the plaintiff to its assured, Robert J. Seedhouse, Jr.

*Judgment accordingly.*