## No. 11,239

### Orleans

## LEOPOLD v. NINTH SENATORIAL DISTRICT DEMOCRATIC EXECUTIVE COMMITTEE

(December 12, 1927.  Opinion and Decree.)

(*Syllabus by the Court*)

1.  Louisiana Digest—Courts—Par. 62.

Whatever may be the opinion of this Court upon any question, as an original proposition, it must yield to the views as expressed in the jurisprudence of the State.

**2. Louisiana Digest—Domicile—Par. 2, 13; Elections by the People—Par. 73.**

Under the settled jurisprudence of Louisiana "an actual bona fide resident" within the meaning of Art. 8, Sec. 1 of the Constitution of 1921, relative to qualifications for office, need not continuously reside in the place of his alleged residence but it will be sufficient if he maintains "such relation with the place or premises as will entitle him at his will, and without making new arrangements therefor on each return to occupy such place whenever his necessities or pleasure required without asking permission of of someone else."

**3. Louisiana Digest—Domicile—Par. 2, 13.**

His family may reside elsewhere and he may conduct his business operations from an office situated in another parish where his domestic establishment is located, and all his children reside.

Appeal from the Twenty-fifth Judicial District Court, Parish of Plaquemine. Hon. E. K. Skinner, Judge, presiding in place and stead of Hon. Claude Meraux, Judge, recused.

Action by Simon Leopold against Ninth Senatorial District Democratic Executive Committee.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

A. Giffin Levy, of New Orleans, attorney for plaintiff, appellee.

J. T. Prowell, Leander H. Perez, Eugene H. Walet, Jr., of New Orleans, attorneys for defendant, appellant.

WESTERFIELD, J. Simon Leopold gave notice of his intention to become a candidate for the Democratic nomination for the office of Senator from the 9th Senatorial District, comprising the Parishes of Plaquemine and St. Bernard, in the Democratic primary to be held January 17, 1928.

An objection was filed to his candidacy by a rival candidate, Clarence Ragus, upon the ground that Leopold was not a resident of Plaquemine Parish, but that on the contrary he resided in the Parish of Orleans.

The Ninth Senatorial District Democratic Committee, to which Leopold's notice of intention and Ragus' protest had been properly addressed, after hearing the parties, maintained the protest and held Leopold disqualified because of non-residence as alleged. An appeal was taken to the Twenty-fifth Judicial District Court of the Parish of Plaquemine, in accordance with the Primary Law, Act 97 of 1922. The judge of that court, Hon. Claude Meraux recused himself and designated Hon. E. K. Skinner of the Civil District Court of the Parish of Orleans to preside in his stead. Judge Skinner reversed the Democratic Committee and ordered Mr. Leopold's name certified to the Secretary of State as a duly qualified candidate. An appeal was thereupon prosecuted to this court. The Court in its reasons for judgment expressed the opinion that Act 97 of 1922 was unconstitutional, because in conflict with Article 3, Section 10 of the Constitution of 1921 providing that "Each house shall be the sole judge of the qualifications, election and return of its members." We believe the learned Judge, a quo, to be in error in this respect, for primaries are not elections. Newberry vs. U. S. 41 Sup. Ct. Rep. 649.

Counsel insists that in this situation we can do no more than remand the case, because it is claimed Judge Skinner considered only the question of constitutionality and we can review only such matters as have been passed on below. Counsel's error consists in confusing Judge

Skinner's reasons and his judgment. What we are called upon to consider is the action of the Court, a qua, not the words. A definitive judgment for plaintiff, ordering Simon Leopold's name certified as prayed for was rendered by the Court and the correctness of this ruling must be considered. See Nevill vs. Parish Committee No. 11,221 of our docket, not yet reported.

Several exceptions were filed, in limine, but only one, no cause of action, is insisted upon here. This exception is based upon the alleged failure of Leopold to sign his affidavit appended to his notice of intention and statement of qualifications filed with the Democratic Committee. The document was annexed to plaintiff's petition and by agreement the rules of the State Central Committee, the governing political body, which prescribes rules for the Parish Committees throughout the State was admitted and it was also agreed might be considered as part of the petition. These rules require an affidavit but the Primary Law does not. Whether the law or the rules control and whether there was, as a matter of fact, a proper affidavit, we deem it unnecessary to discuss. No objection to Leopold's candidacy was made upon that ground and the Committee did not refer to it in its decision. As was said in a case decided by the Supreme Court a few days ago, Adam Melerine vs. Democratic Parish Executive Committee for the Parish of St. Bernard, No. 28987 S. C., where a similar exception was considered:

"Defendant filed an' exception of no cause of action based on the proposition that plaintiff does not allege in his petition facts sufficient to show that he is duly qualified to hold the office to which he aspires. It was not necessary for him to do so; it sufficed for him to allege that he filed his application with the committee in due time and in due form; that his candidacy was objected to; and that said objection was sustained by the committee. For the aforesaid Section 11 requires that any objection to a candidate shall set forth 'in detail' the reason why said candidate is not qualified; so that the only question before the committee is whether said *objections* be well founded. And since the court can only review the decision of the committee, it follows that any other objections which might have been made, but were not made, are wholly immaterial to the issue before the court. And since new objections cannot be urged before the court which were not set up 'in detail' before the committee, it follows that this plaintiff was not called upon to *anticipate* any such new objections by setting forth in his petition, and later on proving, that he has *all* the qualifications required for the office which he seeks. To hold otherwise would amount, in effect, to allowing objections to plaintiff's candidacy to be made for the first time in the courts and not before the committee, and to allow such objections to be made not 'in detail,' but in the most general manner conceivable, to wit, that his petition 'shows no cause of action.'"

On the merits the question is where does Mr. Leopold reside or in the language of the Constitution, of what Parish is he "an actual bona fide resident."

In the determination of this, the ultimate question, we have found much difficulty, and, if we were privileged to regard the matter as an original proposition, might easily have reached a different conclusion. The facts, as we find from the record as are follows:

Mr. Leopold is sixty-five years old. He was born in Plaquemine Parish, married there, his children were born there, and continued to reside there, unquestionably, until 1924, when he sold his home to Albert Schayot, and has since maintained no domestic establishment there, his family having moved to the Parish of Orleans. Leopold always has been and still is a registered voter in Plaquemine Parish, for

forty-four years, he testified, in the same precinct. Following the sale of his house he recorded a declaration of domicile and entered into an agreement with the purchaser of his home reserving two of the rooms in the house for his personal use so long as there should be any of thé purchase price, represented by mortgage held by Leopold, unpaid. On the other hand, Leopold is general manager and secretary of the Lower Coast Construction Company and president and manager of the Highway Construction Company, both corporations have offices in the Godchaux Building in the City of New Orleans, where Mr. Leopold receives his business and personal mail. Mrs. Leopold and both of their two children live in the City of New Orleans. Mrs. Leopold with Mr. Joseph Haspel, No. 3 Everett Place, her son-in-law, where' she entertains socially. Mr. Leopold, when in the City of New Orleans, also resides at No. 3 Everett Place, where he has a telephone in his own name. Mrs. Leopold has an automobile, which is registered in Plaquemine Parish but they own no garage there and use the garage on the premises of Mr. Joseph Haspel. There is no evidence that Mrs. Leopold has ever been in Plaquemine Parish since the sale of their house and several witnesses testify that they have not seen her there. Phoenix, Plaquemine Parish, claimed by Leopold as his home and the place where his house, which he sold, is located, is a community of some seven or eight families. One witness named from memory all the families she said resided there. Manifestly a community too small for a. man of Mr. Leopold's business activity, and too small for Mrs. Leopold's social proclivities as evidenced by newspaper clippings of several entertainments given at "her home" No. 3 Everett Place, which were offered in evidence. We are convinced that Mr. Leo-

pold desired to maintain a political domicile in Plaquemine. He has given ample evidence of it, but it seems equally evident that he did not choose to live there. The two rooms which he reserved, though he was free to occupy them at any time, were at one time rented. to school teachers by Mr. Shayot, though he admits that if Mr. Leopold had appeared the teachers would have had to move. Whatever valuables Mr. Leopold has, he testifies, are in the Parish of Orleans.

But we are not at liberty to indulge our personal views, the jurisprudence is very clear.

To begin with, there is a presumption that the domicile of choice like the domicile of origin once established remains unchanged. Fleming vs. Joyce, 123 La. 630, 49 . So. 218; Caufield vs. Cravens, 138 La. 283, 70 So. 226; Mosely vs. Dabezies, 142 La. 259, 76 So. 705.

In Caufield vs. Cravens, 138 La. 283, 70 So. 226, it was held, on page 287:

"The term, 'actual bona fide resident,' as used in the Constitution, cannot reasonably be interpreted to mean that, in order to acquire, and still less, to retain, such status, one must remain continuously in the town, or upon the premises, of the residence, and the status described is not therefore affected by temporary absences, occasioned by considerations of duty, business, health, or pleasure, unless, being voluntary, they extend beyond prescribed periods, or, are accompanied by the acquisition of residence elsewhere; nor is it affected by absences of indefinite duration if one be engaged in the business of the state, or the United States, or on the high seas, or be a student of any institution of learning. Const. Art. 208, R. S. Sec. 1202. Nor, is is affected by the fact that one resides in a hotel, or boarding house, or in the house of some family connection, since the law prescribes no condition in that respect. The words 'bona fide,' as used in the present Constitution (Article 197), appear to have been

added to the word 'actual,' as used in the Constitution of 1879 (Article 185) merely, as they themselves indicate, to emphasize the importance of 'good faith,' as a factor in the determination of the question of residence, and, by the application of that test, to prevent a person who has two or more residences from calling the one or the other his legal residence as it may suit his interest or convenience, but to the prejudice of the rights of others."

Again on page 285:

"One does not, however, lose his status, as an actual, bona fide, resident of a place, either because he finds it necessary to establish his family elsewhere, or because, in the absence of his family, he does not maintain a domestic establishment at such place. The question is one largely intention, and the intention of a person, in that respect, is determined by his expressions thereof, at times not suspicious, and his testimony, when called on, considered in connection with his conduct and the circumstances of his life."

In Estopinal vs. Michel, 121 La. 879, 46 So. 907.

"The place where a man's family lives does not *determine his domicile, and still less his residence.* The domicile of wife and children follows that of the husband, not that of the husband that of wife and children. In the case of State ex rel. Attorney General vs. Steele, supra, the fact that the defendant had sold his home in Tensas Parish and purchased another in Natchez, Miss., and had removed his family to this new home, was held not to have necessarily had the effect of operating a change of domicile."

In the case of Hall vs. Godchaux, 149 La. 734, 90 So. 145, after stating that the words "actual bona fide resident" did not mean that such resident should occupy his abode every moment during the period necessary to become a resident, the Court said:

"However, we think that he is required to maintain such a relation with the place or premises so selected as will entitle him at his will, and without making new arrangements therefor upon each return, to occupy such place whenever his necessities or pleasure require, and this without having to ask the permission of someone else. This cannot be said to have been true of Judge Godchaux while he was stopping at the De Soto Hotel, under the circumstances which we have outlined * * * If the individual maintains a place to which he can return, as above indicated, he does in law have an actual bona fide residence, and when away under the call of business or pleasure is an absent actual bona fide resident. But we cannot see how it can be said that he is such a resident when he possesses no other right than that of going to a hotel, registering and being assigned a room with no fixed relation thereto, as has been shown to have been the case with Judge Godchaux." (Italics ours.)

In the Godchaux case, the following analysis is made of the Caufield case cited supra:

"In the first case Caufield was a railroad conductor who had many years resided, voted, paid street and poll taxes, and in every way maintained his identity with the town of Wilson, in the parish of East Feliciana. He found it necessary to send his wife and children to the City of Baton Rouge for the purpose of educating the latter, rented a house, and established them there for that purpose. His duties included runs on several different branches of the same railroad, but he was required to report at Wilson, where he has always resided, for the purpose of obtaining orders and assignments for his different runs. When in Wilson he sometimes stopped at a place called the Valley Hotel, and always occupied one of the two rooms, Nos. 2 and 5, set apart for conductors, for which he paid 25 cents per night. And at others he stopped at the home of his father-in-law, for which he paid board. But he did have the privilege at all times of occupying these same quarters * * * "

In Brantley vs. Smith, 6 La. App. 182, it was held that Smith had not lost his residence in Union Parish although he had moved to Arkansas with his family,

was employed there and rented an apartment because—

"The testimony that they retained their establishment in Union Parish during their absence and that they intended all along to maintain their residence in that parish and to return when the first opportunity to get work presented itself is undisputed and is borne out by subsequent events. They acquired no property in nor did they make any effort to become residents or voters in the state of Arkansas."

Finally it was held November 28, 1927, in the case of Adam Melerine vs. Democratic Executive Committee for the Parish of St. Bernard, No. 28987 S. C., Melerine was a resident of St. Bernard because, "There is no doubt whatever of plaintiff's intention in the premises. He was born in St. Bernard and resided there from the age of 10 to 26, when he married, to wit: July, 1925. He has always claimed to reside there, even since his marriage, and to the present day, by registering as a voter, and by paying poll taxes and by voting in said Parish and no where else."

Melerine's parents lived in St. Bernard in a house, the rent of which was paid by Melerine, but the front bedroom was at the disposal of himself and wife whenever he or they chose to occupy it. However, both Melerine and his wife lived in New Orleans. At least he rented a house in New Orleans by the month and all customary municipal conveniences such as telephone, electric light, gas, water, etc., were installed on applications made out either by his wife or himself, and, though he testified that most of his time was spent in St. Bernard, the record of his consumption of electricity when exhibited to the electrical engineer of the New Orleans Public Service provoked the following comment:

"The statement here would seem to indicate that there has been some electricity consumed during every month (July, 1925, to October, 1927) * * * This total consumption here for (by) is not as large as most of the consumers in New Orleans consume. Our average customer here consumes 380 kilowatt hours a year; that is large and small and everything thrown in. This record shows about 220 a year."

The court in this case (Melerine) repeated what was said in the Godchaux case and underscored the words as indicated in the following quotation:

"An 'actual bona fide resident' * * * need not have occupied his place of aboue every moment during the required period of time but *must have maintained such relation with the place or premises as will entitle him at his will, without making new arrangements therefor on each return to occupy such place whenever his necessities or pleasure required without asking permission of someone else."* (Italics ours.)

The only requirement therefore is as emphasized by the jurisprudence that such relation shall be maintained as will entitle the individual without making new arrangements to return to the place of his alleged domicile at his will without asking permission of anybody else. Leopold certainly maintained such relation with the Parish of Plaquemine. He proved an agreement by which he was privileged to occupy two rooms in the house formerly owned by him at any time providing the mortgage given by his vendee was unpaid. It was proven that the mortgage was still unpaid at the time of the trial. It is true that his vendee at one time rented the rooms so reserved to Leopold, but it is not shown that Leopold consented or knew anything about it and it is admitted that Leopold could have dispossessed the occupants at any time.

The judgment appealed from must be and it is hereby affirmed.