REDMANN, Judge
(concurring).
I subscribe to the majority opinion but would expand on its reasoning.
Appellants’ objections to appellee Lem-mon’s candidacy are by law required to be in writing and to “contain, in detail, the reasons for the objection”, LSA-R.S. 18:307, subd. A. We have noted that the detailed objections must alone be the source of the issues before this court; Melerine v. Democratic Parish Exec. Comm., 164 La. 855, 114 So. 711 (1927); Leopold v. Democratic Exec. Comm., 8 La.App. 232 (1927).
The only reasons contained in detail were:
(1) Lemmon’s residence, alleged to be exclusive, in Ward 4 of St. Charles Parish, from 1964 to 1967 while he was registered to vote (since January 1963) as a resident of Ward 2;
(2) his residence, also alleged to be exclusive, in New Orleans from 1967 until the present (or at least April 1970);
(3)his having applied for ad valorem tax homestead exemptions on his New Orleans residence for 1969, 1970 and 1971.
We may disregard the homestead exemptions because, as held in Stavis v. Engler, 202 So.2d 672 (La.App.1967), an exemption on one residence does not prevent a man from having another residence and being a qualified elector and candidate from the area of the other residence.
Thus, on the objections filed, we might disqualify Lemmon only;
(1) because he has not had a residence in the court of appeal district during the two years prior to the election; or
(2) because (even if he has had the required residence of the past two years) he is not a qualified elector because he did not have a residence in Ward 2 (where he has been a registered voter since January 1963) between 1964 and 1967.
The theory he may not be a qualified elector (even though a resident longer than required and even though a registered voter) rests on the unattractive notion that a defective registration cannot be cured by elimination of the defect. Appellants suggest in argument that a man who prematurely registered a few days prior to having the full six months’ residence in a parish could never be a qualified elector, not even after 15 years of residence, except by registering anew. We need not, however, decide the question whether residence defects in registration can be cured by subsequently completing residence. Here, the only evidence is that Lemmon’s residence in the Ward of his registration (at his father-in-law’s home) existed, or lacked existence, to the same extent during both periods in question. Accordingly, if Lemmon has had a residence in Ward 2 during the past two years, he has had it *52 during the whole six years in question (and before); and if not during the past two years, then not during the past six years.
(There is, of course, a difference in the explanations of purpose of having a residence elsewhere during the two periods. In the earlier period, 1964-67, Lemmon had since 1963 a 20-acre tract adjoining Mimosa Park Subdivision and purchased and built a house on a boundary lot in Mimosa Park as an investment and lived in that house while trying to clear, build up and develop the 20-acre tract. My dissenting brother BARNETTE says this house was “built by them for their home”, but their testimony is uncontradicted it was built as an investment. In the later period, 1967 to about now, Lemmon had very young children in nursery school and kindergarten in New Orleans because St. Charles Parish offered no such facilities, and Lemmon purchased and lived in a house in New Orleans to facilitate the schooling of his children. Nevertheless, although the motives for the residences elsewhere were different, the uncontradicted testimony of the Lemmons is that they always kept their residence to the same extent in Hahnville and that in fact their physical presence in and use of the Hahnville house was of approximately the same frequencies and duration during all pertinent periods. Thus, we may answer all issues here by determining whether that claimed residence in Hahnville satisfies the requirements of Const. Art. 7, § 22, of residence in the district for the two years immediately prior to the election.)
The claimed residence in Hahnville is the home of James P. Vial, father of Mrs. Lemmon. It is a very large house, having five bedrooms, six baths and four sitting rooms, outside barbecue area and swimming pool. The house is located 300 feet from Vial’s law office. The Vials maintain it well stocked with food, including six freezers. The only persons who reside there ordinarily at all times are Mr. and Mrs. Vial, who occupy one bedroom. They have a son who has ordinarily been away at school, including summer school, during the past five years; but a second bedroom is set aside for the son. Since Lemmon married the Vials’ daughter, a third bedroom has been used exclusively by them, and as their family grew at the rate of one every 11 months for their first five children, they took over the fourth and at times the fifth bedroom.
After his December 1961 marriage to Miss Vial, Lemmon worked in her father’s law office in Hahnville in the summer of 1962, and at that time, the Lemmons testified, they determined to make Hahnville their residence and to practice law there with Mr. Vial’s firm upon finishing law school. (And, although Mrs. Lemmon at some time left law practice to be more able to care for her growing family, Mr. Lemmon has continuously practiced with Mr. Vial at Hahnville, although he did handle trial of three or four cases for some lawyers in New Orleans, beginning in mid-1968.)
While the initial validity of the Lemmons’ residence with the Vials is not an issue, it may be pointed out that both Lemmon and his wife were law students in New Orleans at the time and had an apartment in Metairie, Jefferson Parish. It does not seem unusual that a man in Lemmon’s position, intending to practice law with his wife and his father-in-law where the father-in-law was long and well established, but having to remain elsewhere to finish law school, should establish a residence with his father-in-law, by residing in the latter’s home, to the extent his studies allowed. Indeed, if a man in Lemmon’s position wanted to establish a residence as he obviously did, it appears he did about all he could and accomplished his intent, unless as a matter of law his necessary absence while attending school prevented him from changing his residence to Hahnville. But see La.Const. Art. 8, § 11, preventing residence for schooling from affecting voting residence.
The first question, then, is whether, when both Lemmon and his wife had finished law *53 school, by their taking up a residence in Mimosa Park Subdivision they gave up their Hahnville residence, as a matter of fact, or as a matter of law.
As a matter of fact, they testify, they continued the same use of their Hahnville residence. And their intention was then, at that unsuspicious time, to retain their residence at Hahnville, as their retained voter registration there shows.
As a matter of law, they could unquestionably have had two residences and selected either as their voting residence; Melerine v. Democratic Parish Exec. Comm., supra; Stavis v. Engler, supra; Leopold v. Democratic Exec. Comm., supra; Caufield v. Cravens, 138 La. 283, 70 So. 226 (1915) ; Daley v. Morial, 205 So.2d 213 (1967). And as a matter of constitutional law, Const. Art. 8, § 11, Lemmon’s absence for schooling could not deprive him of a voting residence.
Thus, from the time of his registration to vote in January, 1963, until he finished law school he certainly could have “resided” in Hahnville although usually sleeping elsewhere; and the same condition prevailed until his wife finished law school in 1964. At that time they had a residence in Hahnville and a residence in Jefferson Parish, spending the bulk of their week day nights at the latter.
When they moved to Mimosa Park under the circumstances above described, they still continued to use, to the same extent or more, their Hahnville residence at the Vials’. The legal question whether they could (as they intended and attempted by remaining registered voters in Hahnville and using the Hahnville residence) in law retain their Hahnville residence; and the same legal question upon their taking a residence in New Orleans for the facility of schooling their children, appear to require an affirmative answer under the jurisprudence.
In Hall v. Godchaux, 149 La. 733, 90 So. 145 (1921), the candidate was held not a resident of the area in which he occupied from time to time a hotel room. The Supreme Court expressly disclaimed any implication that mere physical absence would prevent one from being a resident. At 90 So. 150 it adds
“However, we think that he is required to maintain such a relation with the place or premises so selected as will entitle him at his will, and without making new arrangements therefor upon each return, to occupy such place whenever his necessities or pleasure require, and this without having to ask the permission of some one else.”
Again, in Melerine v. Democratic Parish Exec. Comm., supra, at 114 So. 713, our Supreme Court emphasized the quoted language from the Godchaux case.
The testimony of the Lemmons is quite clear that they did come and go at will at the Vials’ large house in Hahnville, with their several children, without any notice to the Vials and at times when the Vials were out of town. They had their own keys to the house and in the house kept some furniture, clothing (though not their complete wardrobes), medicines and children’s toys. Mr. Vial paid the costs of running the house, as many fathers do although their major children may yet reside with them. We think they meet the test of Hall and Melerine as entitled at will and without new arrangements to occupy the Hahnville residence whenever their necessities or pleasure require, without having to ask Mr. Vial’s permission or anyone else’s.
The factual quantity of use of such a residence is immaterial, Leopold v. Democratic Exec. Comm., supra. In Leopold, the candidate had sold his home in Plaque-mine Parish three years prior to his candidacy for senator from that district, but following the sale recorded a declaration of domicile and obtained from his purchaser an agreement reserving two rooms of the house for Leopold’s personal use as long as the mortgage for the price re *54 mained unpaid. While this court observed it was convinced Leopold
“desired to maintain a political domicile in Plaquemine * * * it seems equally evident that he did not choose to live there. The two rooms which he reserved, though he was free to occupy them at any time, were at one time rented to schoolteachers by Mr. Shayot [the purchaser], although he admits that if Mr. Leopold had appeared the teachers would have had to move. * * * ” 8 La.App., at 235.
We held Leopold’s candidacy valid even though it is obvious he did not make any regular use of his reserved rooms, since the owner rented them to others.
It is true that in other cases, such as Daley v. Morial, supra, and Stavis v. En-gler, supra, the quantity of nights spent per year at the claimed residence exceeded the number claimed here. But Leopold surely shows that this court has considered residence not a quantitative concept but a qualitative concept under the rulings of our Supreme Court in Hall and Melerine. See also Caufield v. Cravens, supra.
Even so, the Lemmons testified their actual presence at the Hahnville residence was regular throughout the period in question. Lemmon’s first statement of the number of nights was “That is difficult to say. I would say twenty-five just as a wild guess.” He explained his prior 60 or 70 percent Hahnville-time estimate thus: “Again I am talking about 24 hours of the day. Like almost every weekend we were in Hahnville and that would be Saturday, Saturday night, Sunday. * * * That would only be only one night but would include a substantial amount of time. Every day during the week I am in Hahnville from early morning to early evening.”
Lemmon testified that was his practice during the school term for his children, but in summertime “quite a bit of the time we were out here, a great percentage during the summer.” And, “We have done that [spent a week in Hahnville] many times, we have spent as long as a week and more, frequently we spent like three days.”
As a qualitative concept, the cases which have rejected a candidate include Hall v. Godchaux, supra, already discussed, and McIntire v. Carpenter, 202 So.2d 297 (La.App.1967). In Mclntire, the candidate was a doctor whose only claim to the additional residence was “[spending] one or two nights a week sleeping on a small ambulance cot which was located in his office”, which also contained a “hot-plate” and a refrigerator. Surely the Vials’ spacious residence is a residence, and an ambulance cot does not make a doctor’s office a residence.
From the fact of voter registration since January 1963, unchanged to the present, and income tax returns since 1964 (for 1963 taxes) reciting Hahnville as their address, and acts relating to immovables reciting St. Charles as their residence (except the 1967 purchase of their New Orleans house, which recites they are residents “of the state” and gives their “mailing address” as the house being purchased although they did not occupy it for some months while repairing it), the trial judge’s conclusion the Lemmons as a fact intended to keep Hahnville as a residence seems free of error.
And from their testimony, which he obviously believed (although only Mr. Lem-mon testified in person before him), we could not say the trial judge erred in accepting as fact the uncontradicted recitals as to use of the residence at Hahnville, etc.
And, to the extent that residence entails a legal conclusion as well as a factual conclusion, we could not, in view of the Mel-erine and Leopold cases, hold that Lemmon as a matter of law had to relinquish his residence at Hahnville when, for reasons he deemed adequate, he maintained another residence first in St. Charles Parish and then in New Orleans, and spent the bulk of his evenings at those other residences.
*55 The judgment appealed from, maintaining his candidacy, is correct.