824 So.2d 1277 (2002)
Terry R. REEVES, Plaintiff-Appellee,
v.
Laura J. JOHNSON a/k/a Laura Jo Johnson and Hon. Donald E. Kelley, in his Official Capacity as Clerk of Court of Winn Parish, Louisiana, Defendants-Appellants.
No. 36,837-CA.
Court of Appeal of Louisiana, Second Circuit.
September 11, 2002.
Writ Denied September 18, 2002.
*1279 Chris J. Roy, Jr., Alexandria, Jacques M. Roy, for Appellants.
Culpepper & Associates by Bobby L. Culpepper, Jonesboro, James E. Lewis, Baton Rouge, Kermit M. Simmons, Winnfield, for Appellee.
Before BROWN, WILLIAMS, STEWART, GASKINS, CARAWAY, PEATROSS, KOSTELKA, DREW, and HARRISON (Pro Tempore), JJ.
BROWN, C.J.
This is an appeal from a judgment disqualifying defendant, Laura J. Johnson, as a candidate for district attorney in the Eighth Judicial District of Louisiana for Winn Parish. The trial court found that Ms. Johnson had not resided in Winn Parish for the two years prior to the election as required by law. For the reasons set forth below, we affirm.

Discussion
On August 28, 2002, Terry R. Reeves, the district attorney for the Eighth Judicial District, filed a petition objecting to the candidacy of Laura J. Johnson for the office of district attorney. Reeves, a registered voter in Winn Parish, had standing to bring the election challenge, and asserted that Ms. Johnson was not qualified for two reasons. First, she allegedly had not been admitted to the practice of law for at least five years prior to the date of the election because of a one year suspension from the practice of law, with six months deferred, by the Louisiana Supreme Court beginning in 1997. Second, Ms. Johnson allegedly had not resided in the Eighth Judicial District, Winn Parish, for two years preceding the date of the election. Ms. Johnson denied Reeves' allegations, and the matter was tried on September 3, 2002.
By virtue of Article III, Section 4 of the Louisiana Constitution of 1974, to qualify for district attorney a candidate must have been admitted to the practice of law in the state for at least five years prior to his (her) election and shall have resided in the judicial district for the two years preceding the election. Similar requirements are stated in La. R.S. 16:1. In Messer v. London, 438 So.2d 546, 547 (La.1983), the court stated that, "Residence and domicile are not synonymous terms. A person can have several residences but only one domicile. Taylor v. State Farm Mutual Auto. Ins. Co., 248 La. 246, 178 So.2d 238 (1965). Domicile is a person's principal domestic establishment, as contrasted to a business establishment."
For our purposes, the critical word in the constitutional provisions concerning district attorney is "resided." Because the election in this case is to be held in October 2002, the critical time period is from October 2000 to October 2002.
Neither the Louisiana Constitution nor Title 16 of the Revised Statutes defines the word "resided." However, in Hall v. Godchaux, 149 La. 733, 90 So. 145 (1921), the Louisiana Supreme Court was called upon to interpret the meaning of the words "actual bona fide resident" under Article 197 of the Louisiana Constitution of 1913. In that case, the nomination of a candidate was contested on the grounds that the candidate was not a qualified elector because of his failure to reside within the state two years, the parish one year, and the precinct six months. The supreme court stated that the words "actual bona *1280 fide resident" were to be given their ordinary meaning and significance. In this regard, the court stated:
In the nature of things, they cannot be said to mean that he must occupy his place of abode every moment during the period of time necessary to become a resident in the sense of qualifying him as an elector; for the necessities of the case require that he should be permitted to pursue the ordinary affairs of life. However, we think that he is required to maintain such a relation with the place or premises so selected as will entitle him at his will, and without making new arrangements therefor upon each return, to occupy such place whenever his necessities or pleasure require, and this without having to ask the permission of some one else.
Hall, supra at 746, 90 So. 145.
Following the reasoning of the supreme court in Hall, supra, we conclude that the word "resided" must be given its ordinary meaning and significance, and we find that the term is synonymous with "lived." In this regard, we note that under the provisions of La. Const. Article III, Section 4, a member of the legislature must be "actually domiciled" for the preceding year in the legislative district in which he seeks election. In Davis v. English, 28, 251 (La.App.2d Cir.09/22/95), 660 So.2d 576, we concurred with the view that the word "actually" serves to emphasize the residence aspect of domicile, and that the apparent intent of delegates to the constitutional convention was to limit the candidacy for political office to citizens who actually live in the district they aspire to represent.
We also note that during the Louisiana Constitutional Convention proceedings conducted on August 23, 1973, the provisions of present Article V, Section 26 were introduced with the explanation that the new constitution would continue the substance of the 1921 constitution, except that the experience requirement was increased from three years to five years. Significantly, we observe that in Article 7, Section 58 of the Louisiana Constitution of 1921, a district attorney was required to be "an actual resident" of the district and a qualified elector of the same. This observation adds further weight to a determination that the intent of the delegates was for district attorney candidates to actually live in the district they seek to represent.
Because the word "resided," like the words "actually domiciled" are of constitutional origin, we conclude that the same delegates who wanted to limit candidacy for the legislature to citizens who actually lived and were domiciled in the district, also desired to limit candidacy for district attorney to citizens who have actually lived in the district for the two years preceding election. Thus, we agree with the trial court's conclusion herein that the intent is for persons running as elected officials from a particular area to live in that area so that they will know the particular issues and concerns of their constituents. The trial court found that Ms. Johnson did not live in the judicial district to which she was seeking office from at least September 15, 2001, until June or July 2002.
Ms. Johnson is presumed to meet the qualifications for office until the contrary is shown. This case turns on a question of credibility. In that respect, the trial court, rather than a reviewing court, is in the best position to judge. An appellate court may not set aside the trial court's findings of fact in the absence of manifest error, or unless they are clearly wrong. Stobart v. DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly *1281 wrong or manifestly erroneous. In Stobart, supra, at 882-883, the supreme court explained the application of this test:
[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" (Citations omitted). This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

Reeves first called Ms. Johnson to testify. She gave her address as 4073 Harrisonburg Road in Wheeling, which is in Winn Parish. According to Ms. Johnson, in September 2001, she moved from Wheeling to 756 St. Maurice Lane in Natchitoches Parish. She took some of her clothing, personal items and furniture with her. During the past two years, she continued to maintain a law office in Natchitoches Parish and did not have an office in Winn Parish.
Ms. Johnson also testified that she owned a house next to her mother's home in Natchitoches. Ms. Johnson's house was located at 1409 North Fifth Street, while her mother's house was located at 1407 North Fifth Street. During the preceding two years, she had claimed homestead exemption on the Natchitoches Parish property, but removed the exemption around the end of June or the beginning of July 2002. She did not claim homestead exemption on the Winn Parish residence because she did not own that property.
Ms. Johnson's children attended school in Natchitoches Parish during the preceding school year, and Ms. Johnson was registered to vote in Natchitoches Parish from August 1996 through July 2002. Ms. Johnson also maintained a business address in Natchitoches at 225 Touline Street. She testified that she received mail at the Wheeling address from March 2001 through September 15, 2002, but did not check the mail every day.
Ms. Johnson was neither a member of the Winn Parish Bar Association, nor the Natchitoches Parish Bar Association, but was an indigent defender in Natchitoches Parish. She admitted to being suspended from the practice of law by the Louisiana Supreme Court from October 10, 1997, through June 30, 1998. Ms. Johnson's mother died in March 2002. Ms. Johnson testified that in June 2002, she started *1282 moving back to Winn Parish, cleaning and coming back more frequently to the Wheeling home. Her children were at the Wheeling home during Christmas 2001, and she had been there before the holidays to get some Christmas ornaments. When asked why she moved back to Winn Parish, she stated that she had the use of a four-bedroom brick home on 60 acres with some cows and horses that had been given to her children by Jimmy Aymond and, "I would have been a fool to give that up." She testified that she broke her lease in Natchitoches Parish after her mother passed away because there was no reason for her to stay there anymore. She did not take her children out of school in Natchitoches Parish following her mother's death in March until the end of the school year in May. More than a month after school was out, she had moved back to Wheeling "full time." She testified that she believed, "I absolutely have residency in Winn Parish, at the Wheeling address. I have always believed that."
The next witness to testify was Rick Hargis, the tax assessor for Natchitoches Parish. Pursuant to his testimony, it was shown that Ms. Johnson had claimed homestead exemption on the property in Natchitoches Parish and had done so through July 11, 2002.
Tina Gongre testified next. She was a mail carrier in Winn Parish and noted that in the year 2001, the mail had so "stacked up" at the Harrisonburg Road residence that under postal regulations, she was required to return the mail to the post office. Ms. Johnson had never turned in a change of address form, and in June 2002, Ms. Johnson stopped Ms. Gongre on the side of the road to tell her that she had returned. Prior to April 2001, Ms. Gongre testified that she had delivered mail to Ms. Johnson for about three years. Ms. Gongre's testimony concerning the mail "stacking up" in early 2001 was corroborated by the postmaster, Robert Taylor.
The next witness was Huey Hale, a neighbor of Ms. Johnson in Winn Parish. Mr. Hale lived two houses down from Ms. Johnson's residence. He testified that in "the early part of 2001," she had stopped and asked him to air up some tires, saying she had to go to Natchitoches to take care of her mother. He did not see her again until approximately two months prior to the trial. Also, about two months before trial, he had seen her children riding four wheelers, dirt bikes and horses on the road. On cross-examination he admitted that he could not see her house from his house and that he might have aired the tires up in the middle of 2001 as opposed to early 2001. He also stated that Ms. Johnson had mentioned that her mother had cancer.
Jackie James, an employee of the Winn Parish Sheriff's Department, testified next concerning a burglary at the Wheeling residence in 2001. He testified that someone had broken into the back window and had stolen some saddles and a bridle. He also testified that as far as he could tell, no one lived in the house. Ms. Johnson's daughter also said that no one lived there. There were spider webs and dust and "stuff just stacked in the floor and all." On cross-examination, he admitted that he had only been in the kitchen and the den and did not go into the bedrooms. He did not know if there were beds or clothes in the house.
The next witness to testify was Sandra Franklin, who rented a house next door to Ms. Johnson's residence. Ms. Franklin began staying in the rented house on April 7, 2002, and lived there for three months. During that time, she saw no one at the house other than Jimmy Aymond, from whom she rented her residence. According to Ms. Franklin, Aymond had taken a *1283 man to Ms. Johnson's residence one day and had told Ms. Franklin that he had leased the house to the man. Her testimony was interrupted by hearsay objection.
Eighth Judicial District Judge Jimmy Wiley was the next witness. He testified that in April or May 2001, Ms. Johnson had told him that she did not live in Winn Parish; that she lived in Natchitoches and had an office in Natchitoches; and that she was not going to accept any more criminal appointments in Winn Parish. On cross-examination, Judge Wiley stated that Ms. Johnson never used the term residence in the conversation and was a bit perturbed about sentences her clients received in the Eighth Judicial District court. However, the judge subsequently qualified his statement to say that instead of Ms. Johnson being "perturbed," she differed with the judge's "approach to sentencing." Challenger, Terry Reeves, testified after Judge Wiley. He corroborated Judge Wiley's testimony concerning the conversation between Judge Wiley and Ms. Johnson.
Following his testimony, Reeves rested. After a recess, defendant called Jimmy Aymond as her first witness. Aymond testified that he and Ms. Johnson first met in 1989 and that together they had an 11-year-old son named Zach who was presently living with Ms. Johnson. He owned the house Ms. Johnson used in Wheeling and lived "right down the road." In mid-1999, he convinced Ms. Johnson not to move to Arkansas which would have been an eight or nine-hour drive for him to visit his son. He did so by offering her the Winn Parish residence in Wheeling in which to live; she accepted, moving in during the summer of 1999 along with her children. No restrictions were placed on her residence. Zach was enrolled in school in Atlanta, which is in Winn Parish, in January 2000, and his half-sister Rebecca also attended school in Winn Parish. The children had some animals of their own, and Aymond gave them some horses and cattle that stayed on the property and on the other side of the road. The children enjoyed riding the horses. According to Aymond, Ms. Johnson and the children left the home and went to Natchitoches in the fall of 2001. In the late summer of 2001, Ms. Johnson asked Aymond if he would take care of the cattle. She told him that her mother had cancer and she was going to get a place to stay in Natchitoches so that she could work there and take care of her mother without having to come back to Winn Parish every day. Aymond asked her what she was going to do when her mother died, and Ms. Johnson informed him that she was going to come back to live in Winn Parish. Aymond testified that he never tried to lease the house and that Ms. Johnson came back to it in the summer of 2002.
Aymond testified that Ms. Johnson had furniture in the house during the time she was gone and that after the break-in, he had gone into the house to check on everything. He testified that there was some furniture in the house at that time. He also testified that his son, Zach, had continued to live in the home through the end of the school year in May 2001. Zach also spent some time there in the summer of 2001. Aymond also indicated that in addition to Zach and Ms. Johnson's daughter, Rebecca, Ms. Johnson had a nephew who lived in the residence in the early part of 2001. Specifically, Aymond remembered fishing with the nephew on Valentine's Day 2001; this fishing trip was memorable because the boy caught an eight-pound fish on a lake at Aymond's house.
On cross-examination, Aymond admitted that the house was sparsely furnished during the year from summer 2001 to summer 2002. He also admitted that he liked to *1284 travel and that he was out of town a good bit during that time frame. On some weekends during this time, Zach would come to Winn Parish on weekends and would ride horses and the four-wheeler.
Aymond specifically denied that he ever took anyone to Ms. Johnson's residence to see about renting or leasing it, and he stated that if he had told Ms. Franklin he was going to lease the house, what was said was that he was going to lease the house if Ms. Johnson was not going to return.
Danny Hall, the next witness, testified that he was an investigator with the Natchitoches Parish District Attorney's Office and that he had met Ms. Johnson approximately two years previously when she began to do IDB work in Natchitoches Parish. He had learned that Ms. Johnson's mother had cancer, and he knew she was in Natchitoches taking care of her mother, although he did not know where she lived in Natchitoches.
The next witness, Sonny Viola, lived directly across Harrisonburg Road from Ms. Johnson's residence. He recalled Ms. Johnson moving into the residence in 1999 with her children and stated that the children attended school in Winn Parish. He verified that there were horses and cattle on the property and knew that while Ms. Johnson was at the address on a regular basis "for a long time," she later was "kind of in and out." He also testified that during the time she was "in and out," he would see her return from time to time. She would get her mail, and the children would ride horses in the pasture. Viola's grandson would visit with Zach on the occasions when Ms. Johnson would return to the Winn Parish residence, and the boys would fish in the pond and ride four wheelers and horses. According to Viola, no one other than Ms. Johnson ever moved into the home over the last three years, and he was aware that she was now living back there. On cross-examination, he indicated that he was not aware that Ms. Johnson's mail from April 2001 to June 2002 was sent back to the post office. His mailbox was next to hers, and because the box did not have a front on it, he would notice that it often had mail in it. He stated that he saw mail "all the time" and that sometimes there was so much he would take it out and bring it to his house for Ms. Johnson to pick up. However, he admitted that he could not say that this occurred between April 2001 and June 2002.
James Mark Johnson, defendant's brother, was the next witness. He testified that their mother became terminally ill in 2000, that he and his sister had a conversation about the matter, and that Ms. Johnson planned to move to Natchitoches and lease or rent a house there. Johnson stated he thought that Ms. Johnson would return to Winn Parish because she had to pay no rent there, compared with rent of approximately $700 a month in Natchitoches. He confirmed that Ms. Johnson could come and go as she pleased in Winn Parish, as could her children, and that he had allowed his son, Adam, to live with Ms. Johnson in Winn Parish at the beginning of the second semester of school in 2001. When asked about Ms. Gongre's testimony that no mail was picked up in April 2001, Johnson indicated that Ms. Johnson was still living there at the time because his son was living there also.
On cross-examination, Johnson indicated that Ms. Johnson owned a house next to her their mother's home in Natchitoches, but that someone was living in the house at the time she went to Natchitoches to take care of their mother. When asked why Ms. Johnson didn't make the occupants move out so that she could move in, Johnson responded that one would "have to know Laura Jo and I don't believe she *1285 would throw anybody out in reference to something like that. I don't believe she is that way."
Ms. Johnson then testified. She stated that she currently was residing at the Winn Parish address and had been living there since May or June 1999. She had a law office at 225 Touline Street in Natchitoches and had an address on St. Maurice Street in Natchitoches beginning in September 2001, when she moved to take care of her terminally ill mother. She testified that her move was a family decision made by her brother, herself, and her oldest daughter. During this time, the utilities and telephone were maintained at the Winn Parish address. From September 2001 until her relocation back to Winn Parish, she stayed at the Winn Parish residence "more in the beginning much less toward the end." In May or June of 1999, she moved into the Winn Parish residence because Aymond wanted to keep Zach there instead of Ms. Johnson moving to Arkansas. She stated that she had maintained a residence there until the present time. She had practiced law in Natchitoches Parish since 1996.
Upon learning that her mother was terminally ill, she did not immediately get a residence in Natchitoches. Initially, she traveled back and forth until that became a problem because of her mother's inability to do everyday things and because the children were in school in Winn Parish. She leased the house in Natchitoches in September 2001 for a term of one year. She continued to maintain her residence in Winn and took the children there to ride horses. When asked if it was her intent to return to Winn Parish after her stay in Natchitoches, she stated "absolutely." She paid no rent in Winn Parish and only had to pay for utilities and a satellite dish.
Ms. Johnson clarified that when she first moved into the Winn Parish residence in 1999, the children were enrolled in private schools in Natchitoches. The first semester, from August through December, 1999, she took them to school. Then she decided to enroll them in school in Winn Parish at Atlanta beginning in January 2000. They remained there until she went to Natchitoches. At that time they began attending school in Natchitoches and continued through May 2002.
Ms. Johnson's driver's license address was never changed to Natchitoches Parish, but remained the Winn Parish address. She also testified concerning her home address with the State Bar Association. She indicated that she gave her Winn Parish telephone number as a secondary residence number.
With respect to her suspension by the Louisiana Supreme Court, she testified that she was suspended for less than a year, and at the time of qualification for the race, she had been admitted to the Louisiana State Bar for 22 years.
On cross-examination, she went back over the conversation she had with Judge Wiley and admitted that she had indicated to him that she did not live in Winn Parish and that her office was in Natchitoches. She also testified that she was very upset at that time about the way cases were being handled in Winn Parish and did not want to take any more criminal cases in that parish. She also admitted that she did not physically live on the property in Natchitoches for which she claimed the homestead exemption.
The last witness to testify was Jimmy Aymond, who was recalled to the stand to clarify that his testimony had nothing to do with support, custody or visitation with his son, Zach. After the trial, the court issued a written ruling explaining its decision in the case.
*1286 The court stated that the evidence showed that Ms. Johnson was admitted to practice law in Louisiana on October 5, 1979, and currently was in good standing and sufficiently qualified to perform the duties of an attorney. The court also noted that the evidence showed the Louisiana Supreme Court in September 1997 had suspended Ms. Johnson from the practice of law for one year, with six months of the suspension deferred. The court found that neither the language of the Louisiana Constitution nor the revised statutes indicated that a candidate for district attorney had to have been admitted for five uninterrupted years prior to his or her election in order to be qualified. Accordingly, the court rejected Reeves' first objection to Ms. Johnson's candidacy. The trial court then turned to the question of whether Ms. Johnson had resided in the district for the two years preceding the election.
After reviewing the evidence presented, the court stated that there appeared to be no question that Ms. Johnson had established residency in Winn Parish in 1999. The court then stated that by her own admission, Ms. Johnson had moved to Natchitoches in September 2001 to care for her ailing mother; that she moved some furniture and clothes with her; and that she had claimed homestead exemption in Natchitoches Parish during the two years prior to the election scheduled for October 2002. She owned no land in Winn Parish during that time; her children were enrolled in school in Natchitoches Parish, she voted in Natchitoches; paid taxes on immovable property in Natchitoches Parish; she listed her address as Natchitoches with the Louisiana State Bar Association; and she indicated to Judge Wiley that:
She was a resident of Natchitoches Parish, she was no longer a resident of Winn Parish, her office was in Natchitoches Parish and she declined to take any more indigent assignments in Winn Parish.
On the other hand, the court noted that her attorneys had presented the testimony of Jimmy Aymond that he allowed Ms. Johnson to live on the Winn Parish property because she was contemplating moving to Arkansas and that he offered her a place to stay so that his son would not be several hours removed for the purpose of visitation. Aymond testified that the property was hers "rent free," she could come and go as she pleased, and have over whomever she wanted. The court also noted that it had heard from Sonny Viola, who knew that Ms. Johnson had moved in the house across from him sometime in 1999, and from Mark Johnson, who stated that Ms. Johnson moved to Natchitoches to care for their ailing mother, but felt that she would return to Winn Parish after their mother's death. The court observed that Ms. Johnson herself testified on direct examination that it was her intent to return to Winn Parish, that she never abandoned the property there, and that she was in Natchitoches Parish solely for the convenience of caring for her ailing mother.
However, the court found that her testimony and recollections of the times she had "resided" in the house on Harrisonburg Road "simply does not meet what this court determines to be residence requirements as contemplated by the previously-cited constitutional article and revised statute." After quoting from Black's Law Dictionary on the terms "residence," "residency," and "resident," the court stated that it felt the legislative intent was to have the persons running as elected officials in a particular area to live in that area so that they would know the issues and concerns of the constituents. With this interpretation, the court found that Ms. Johnson did not live for the previous *1287 two years in the judicial district which she was seeking office.
The court stated that it felt that Ms. Johnson's responses to questions were "after-the-fact explanations of her activities over the past several years dating back to 1999." The court stated that it could not go unnoticed that Ms. Johnson in the past had been less than truthful and cooperative concerning:
the filing [sic] out of certain documents declaring various addresses, maintaining homestead exemptional property on which she did not live according to her testimony, giving incorrect statements about where she resided to the Louisiana State Bar Association and her unwillingness to cooperate with the bar association and the investigation which ultimately led to her suspension.
On the other hand, the court found Barbara Clark, Deborah Waskom, Rick Hargiss, Tina Gongre, Robert Taylor, Jackie James, Sandra Franklin, and Judge Jim Wiley to be truthful independent witnesses with no interest in the outcome of the case. The court found that Terry Reeves had established by clear and convincing evidence that Ms. Johnson had not resided in Winn Parish for two years prior to the election scheduled for October 2002. Accordingly, the court found that she was disqualified as a candidate for the office of district attorney in the Eighth Judicial District.
The mere fact that Ms. Johnson had another residence and domicile in Natchitoches Parish does not mean that she could not also have resided during the same time period in Winn Parish. Furthermore, we agree with the trial court's finding that Ms. Johnson established residency in Winn Parish in 1999. Thus, the question is whether it can fairly be said that Ms. Johnson no longer lived in Winn Parish following the time that she moved from Wheeling to Natchitoches to take care of her mother. Of course, in the literal sense, Ms. Johnson plainly did not "actually" live in Winn Parish during this time period. She admitted as much to Judge Wiley, and her daughter related as much to the law enforcement officer, Jackie James, who investigated the burglary.
Even though Ms. Johnson was not actually living in Winn Parish from September 2001 to June or July 2002, we borrow from the reasoning in Hall, supra, to say that the word "resided" cannot mean that a person must have occupied a place of abode every moment during the period of time necessary to become a qualified candidate for district attorney. As in Hall, supra, we recognize that one must be permitted to pursue the ordinary affairs of life. Certainly, tending to a terminally ill parent is a valid reason for residing more in Natchitoches Parish than in Winn Parish. However, we conclude that at the very least one must retain minimal indicia of living at an abode in order to legitimately say that one is residing there.
The question of whether such minimal indicia exist is factual, and an appellate court may not set aside the trial court's findings of fact in the absence of manifest error, or unless they are clearly wrong. Rosell v. ESCO, supra.
As previously indicated, the trial court in this case found the testimony of certain witnesses, including Tina Gongre, Robert Taylor, Jackie James, Sandra Franklin, and Judge Jim Wiley, to be truthful. Notably absent from this list was Jimmy Aymond, whose testimony conflicted with that of Sandra Franklin on the question of whether or not Aymond, after Ms. Johnson had moved to Natchitoches, took a man to the Wheeling house in connection with leasing the residence to him. Other than Aymond, Ms. Johnson herself was the only *1288 other witness to directly testify regarding her intent to return to the Wheeling home following her mother's death; in light of the court's statement that it felt that Ms. Johnson's responses to questions were "after-the-fact explanations" of her activities dating back to 1999, it is obvious that the court found Ms. Johnson not to be very credible as a witness.
Additionally, the court noticed that Ms. Johnson had maintained a homestead exception on property where she did not live according to her own testimony, and the court obviously did not credit Ms. Johnson's explanation of the information which she provided to the Louisiana State Bar Association concerning her residence. Although Ms. Johnson's counsel has complained about the court's reference to her unwillingness to cooperate with the bar association and the investigation which ultimately led to her suspension, the trial court plainly noted several other reasons for its credibility determination with respect to Ms. Johnson. See In Re Johnson, 97-0879 (La.09/26/97), 700 So.2d 1260.
In giving full deference to the trial court's factual findings, we find that Ms. Johnson was not living at the Wheeling address from September 15, 2001, through June or July 2002. She was not picking up her mail, and at best, she made only a few visits to Wheeling so that her children could ride horses. Although she apparently had not turned off the utilities to the house, Jackie James' testimony showed that no one was living in the house at the time of the burglary. In addition to items stacked on the floor of the den, there were spider webs and dust which further showed the lack of any attempt to maintain the home as a residence. We also observe that the saddles and bridle that were stolen were being stored in the den, and that storage of such items in a den is not consistent with use as a residence. All in all, the evidence showed that Ms. Johnson had allowed the condition of the residence to degrade to the point where one could not reasonably say that the house was ready for human habitation.
Because the trial court found that Ms. Johnson was not living in the Wheeling house, and because the evidence indicated that the house, despite having utilities, was not being kept in a condition for use as a residence, we find no manifest error in the trial court's ultimate conclusion that Ms. Johnson had not resided in Winn Parish for the two years prior to the election scheduled for October 2002. Accordingly, we affirm the trial court's judgment disqualifying her as a candidate for the office of district attorney in the Eighth Judicial District.
The other issue concerning Ms. Johnson's suspension is now moot.

Conclusion
For the reasons set forth above, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
CARAWAY, J., concurs with written reasons.
WILLIAMS, J., concurs without written reasons.
STEWART, J., dissents with reasons to follow.
CARAWAY, J., concurring.
I concur fully with the majority opinion's review of the constitutional provision. The Civil Code, however, provides an important backdrop for the difficulty which persists over the concepts of domicile and residency. I therefore would add the following:
Significantly, the allowance for multiple residences has its roots in La. C.C. art. *1289 38.[1] That article nevertheless defines domicile and is the first article in Book I, Title II of the Civil Code dealing with domicile. A person's domicile "is in the parish wherein he has his principal establishment." Id. A change of one's domicile requires the key element of intent to change the "principal establishment." La. C.C. art. 41. There is more permanency to domicile than merely one's residence. Despite a new residence out of the parish of domicile, a person can intend to keep that domicile. That "intention" is shown by the various circumstances pertaining to what the person retains within the parish of his domicile and the nature of his residence elsewhere. La. C.C. art. 43. The multiple residency concept is therefore a secondary consideration for the primary concept of domicile.
Nevertheless, the constitutional article now under consideration makes residency for two years, and not domicile, the primary focus for the office of district attorney. As pointed out by the defendant, while the concept of multiple residences has considerable jurisprudential support in the consideration of domicile, the tests for how a person maintains multiple residences over time and how a person might end one residency in a multiple residency setting are not so clearly developed. Defendant argues that just as domicile can be retained by one's intentions despite residency outside the domicile, a residency in one parish can be maintained by mere intentions without any notable act of residing in that parish for nine months.
I disagree. The "intention" concept of Civil Code Article 43 pertains to the maintenance of domicile in the absence of residency at that domicile and not to the retention of residency. This is particularly significant in the present case where, by September 2001, the defendant returned to live in Natchitoches Parish, which had remained the parish of her domicile even while she lived in Winn Parish. The trial court's ruling that the defendant had established a residence in Winn Parish does not diminish the fact that her domicile, evidenced by her voting, her place of business, and her ownership of property, remained in Natchitoches. Therefore, defendant's return to Natchitoches in September 2001 to reside again in her domicile is a significant factual event that can easily be viewed as having ended her residency in Winn Parish. The possibility or intention that she might return to reside in Winn Parish at some indefinite time in the future upon the expected death of her mother does not negate the fact that she resided in Natchitoches Parish and not Winn Parish for those nine months within the crucial two-year period. Residency outside of one's domicile should not be so easily retained by mere "intention" when the party has ended that residency and returned to reside in the important place of her domicile.
STEWART, J. dissenting
I must respectfully dissent. The majority fails to consider a threshold issue by affirming the trial court, that is the burden of proof. Without a proper analysis of the burden of proof, one cannot adequately resolve the matter before the court. The trial court determined that Johnson had *1290 established residency in Winn Parish in 1999. Consequently, it was the burden of Reeves to demonstrate that was forfeited or lost. It appears that the majority has impermissibly placed the onus on Johnson to demonstrate that she never intended to give up her residence. The evidence clearly shows that Johnson evidenced her subjective intent to continue to maintain Winn parish as a residence.
In addition, the majority's interpretation of the word "resides" is inconsistent with the legislative history and jurisprudence regarding the residency requirement for an aspirant for public office. The fact that a residence, of which a person may have many, is maintained for political purposes does not itself prevent a residence from being bona fide. See McClendon v. Bel, 00-2011 (La.App. 1 Cir. 9/7/00), 797 So.2d 700. It is axiomatic that one may establish residence purely for political purposes.
A person may maintain more than one residence and the fact that one is maintained for political purposes does not itself prevent the residence from being actual and bona fide. Intent to maintain a residence is an important factor, but intent alone does not establish a bona fide residence. There must be actual, physical use or occupation of quarters for living purposes before residence is established.
Soileau v. Bd. of Supervisors St. Martin Parish, 361 So.2d 319 (La.App. 3d Cir. 1978). To establish residency, the threshold merely requires actual physical use of some type of occupation for living purposes; a place of abode is all that is needed. McClendon, supra; Williford v. Grady, 96-1040 (La.App. 3d Cir.8/5/96), 688 So.2d 1072. Even a temporary absence from a place of residence does not necessarily mean that a person ceases to be a resident. Williford, supra. The rationale is that residency is not lost as long as residence exists in fact with the requisite intent. Again, it is undisputed that residence was established in 1999. The only issue is whether it was somehow lost despite her obvious intent to maintain Winn Parish as a residence.
Because of the presumption for the benefit for the challenged person that exists for residency must be overcome. The majority erroneously bootstraps the supreme court's interpretation of the phrase "actual bona fide resident" under Article 197 of the Louisiana Constitution of 1913 to the meaning of "resides" under Article 5 of the Louisiana Constitution and Title 16 of the Louisiana Revised Statutes. We refer the majority to the supreme court's decision in Melerine v. Democratic Parish Exec. Committee, 164 La. 855, 114 So. 711 (1927) where the court defined residency in an election case stating:
The `residence' necessary to constitute a qualified voter has thus been defined by this court: The term, `actual bona fide resident,' cannot reasonably be interpreted to mean that, in order to acquire, and still less, to retain, such status, one must remain continuously in the town, or upon the premises of the residence, and the status described is not therefore affected by temporary absences, occasioned by considerations of duty, business, health, or pleasure, unless being voluntary, they extend beyond prescribed periods, or are accompanied by the acquisition of residence elsewhere.
(Emphasis added).
The evidence clearly show that the sole reason Johnson left her home in Winn parish and went to Natchitoches was to take care of her terminally ill mother. The decision that she would be the one to move to Natchitoches was a family decision made after conferring with her brother and sister. Her intent to never leave *1291 Winn Parish is established by the fact that she returned there almost immediately after her mother's death earlier this year, staying only to allow her children to finish the school year in their respective schools. I believe that the plaintiff failed to meet his burden of proof in demonstrating that the Johnson lost her residence status in Winn Parish; therefore, I would reverse and render in favor of the defendant.
NOTES
[1] La. C.C. art. 38 provides:

The domicile of each citizen is in the parish wherein he has his principal establishment.
The principal establishment is that in which he makes his habitual residence; if he resides alternately in several places, and nearly as much in one as in another, and has not declared his intention in the manner hereafter prescribed, any one of the said places where he resides may be considered as his principal establishment, at the option of the persons whose interests are thereby affected.